**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JOHN J. STANZ** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:**   **1:25cv272 (LLA)** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

Plaintiffs JOHN J. STANZ, JOHN C. STANZ, LISA DESTRO, STACY WAITE, AMY

PAVLOVICH, TARA ARCHFIELD, CASSIE STRONZ, JOSEPH STANZ, MARC

LALIBERTE, JULIETTE LALIBERTE, individually and as guardian of H.L., SHYANNE

LALIBERTE, JULIA LALIBERTE, JAMES LALIBERTE, BETSY LALIBERTE, JOHN

LALIBERTE, JASON ROBERTS, CHRISTINA ROBERTS, and JOHN ROBERTS,

(collectively referred to herein as "Plaintiffs"), come now before this Court seeking the entry of

default judgment and the awarding of damages against the Islamic Republic of Iran ("Iran"), and

in support thereof state as follows:

## I.  INTRODUCTION

Late on August 15, 2009, into the early morning hours of August 16, 2009,[1] John J. Stanz

("Johnny"), Marc Laliberte ("Marc"), and Jason Roberts ("Jason") (collectively, the "Victim

Plaintiffs") were riding in the sixth vehicle of a convoy deployed to interrupt insurgent activities

---

[1] Certain documents identify the date of this attack with both dates—August 15 and August 16; which is likely no more than a time-zone related complication. One first-hand eyewitness report states that the attack occurred at "approximately 2319 Zulu time, 0349 Local time." As a result, Plaintiffs may have used either date in the past (e.g. the Complaint uses August 15) and will rely on documents that use both dates interchangeably, but this distinction is of no substantive relevance. As shown below, Plaintiffs will simply refer to this event as "the Attack" for the purposes of this Motion.

that were actively seeking to disrupt upcoming Afghan elections. That vehicle was struck by a large explosive device that had been embedded in the ground and activated to specifically target American security forces ("the Attack"). The armored vehicle was launched more than ten feet into the air. The driver and one other occupant were killed immediately as the vehicle burst into flames. The Victim Plaintiffs were each thrown from the vehicle and sustained severe injuries.

The Attack was planned, authorized, and executed by the Taliban, with the material support and resources of Iran, who routinely sponsored the Taliban for the express purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including the commission of attacks against United States personnel and interests, such as the Attack.

By knowingly and intentionally providing material support and resources to enable and assist the Taliban to carry out international acts of terror, Iran has forfeited its immunity under the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1605A. Iran is therefore liable to the Victim Plaintiffs and their families.

## II.     PROCEDURAL HISTORY

Plaintiffs filed their Complaint on January 30, 2025. ECF No. 1. Plaintiffs then requested service under 28 U.S.C. § 1608(a)(3) on March 6, 2025, ECF No. 6, which was dispatched by the Clerk's Office on March 12, 2025, ECF No. 8. That attempt was unsuccessful. ECF No. 9.

After waiting the requisite thirty days, Plaintiffs initiated diplomatic service to Iran pursuant to 28 U.S.C. § 1608(a)(4), ECF No. 10, which was then mailed by the Clerk on April 15, 2025, ECF No. 12. Iran was formally served via the U.S. State Department on December 21, 2025. ECF No. 16.

Plaintiffs filed their Affidavit for Default on March 2, 2026. ECF No. 18. The Clerk entered default against Iran the following day. ECF No. 19.

### III.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF EVIDENCE PRESENTED IN A RELATED PROCEEDING

A trial court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This inherent power includes the ability to take judicial notice of "court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) (the "court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding.")). Based on this principle, and in response to "the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Rimkus*, 750 F. Supp. 2d at 171.

Taking judicial notice of related proceedings "does not conclusively establish the facts" for purposes of the case at bar. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010). Instead, the trial court takes judicial notice of the earlier record for the purpose of reviewing "'evidence considered' in the prior proceeding 'without necessitating the re-presentment of such evidence.'" *Salzman v. Islamic Republic of Iran*, Case No. 1:17cv2475, 2019 WL 4673761, at *3 (D.D.C. Sept. 25, 2019) (quoting *Murphy*, 740 F. Supp. 2d at 59).

The Attack was also recently at issue in another case before this District. *See generally*, *Cabrera v. Islamic Republic of Iran*, Case No. 1:18cv2065 ("*Cabrera*").[2] Therein, the trial court received evidence concerning the commission of the Attack by the Taliban and Iran's relevant material support for the Taliban. Based on that evidence, the court in *Cabrera* ultimately found

---

[2] References to docket entries or pleadings from *Cabrera* will be cited herein as "*Cabrera*, ECF No. X."

that "Iran's material support for the Taliban substantially contributed to the Taliban's ability to conduct this attack." *Cabrera*, 2022 WL 2817730, at \*18.

For the purposes of the matter at hand, this Court is free to take judicial notice of the expert testimony presented in *Cabrera*. The same theory of liability is central to both cases, namely that Iran provided material support to the Taliban which substantially contributed to the commission of the Attack. Therefore, Plaintiffs respectfully suggest that this Court take judicial notice of the Expert Report of Steven A. Wood, LTC, USA (Ret.). *See Cabrera*, ECF No. 59-3.

## IV.   LEGAL STANDARD FOR ENTRY OF DEFAULT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); 28 U.S.C. 1608(e). This standard is identical to the standard for entry of default judgment against the United States under Fed. R. Civ. P. 55(d). *See Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003).

"When the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 207–209, 212 (D.D.C. 2012) (evidence received via sworn affidavits); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (by taking "judicial notice of related proceedings and records"); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006) (with or without a live evidentiary hearing).

4

Evidence "satisfactory to the Court," 28 U.S.C. 1608(e), may require an evidentiary hearing, but it can also consist of "sworn affidavits or declarations, prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules of Evidence." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020). "[I]ndeed, 'the quantum and quality of evidence that might satisfy a court can be less than that normally required.'" *Owens v. Republic of Sudan*, 864 F. 3d 751, 785 (D.C. Cir. 2017) (quoting *Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)).

In weighing the evidence, the trial court must consider Congress's stated purpose in enacting Section 1605A—to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *Han Kim*, 774 F. 3d at 1048 (citation omitted), while simultaneously recognizing the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens*, 864 F.3d at 785. Although "[t]he Court must scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), it should also "accept as true the plaintiff's uncontroverted evidence" when the foreign state has provided no defense. *See Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007).

## V.    BRIEF STATEMENT OF FACTS

### A.    <u>The Taliban and Iran</u>

The Taliban are a Sunni terrorist organization operating within and, at various times, controlling the nation of Afghanistan. *Cabrera*, ECF No. 59-3 at 22. At all times relevant to this case, the Taliban was active throughout Afghanistan and actively opposing both American forces and the Afghan government the American forces were there to support. *Id.* These military and

5

political goals were consistent with Iran's own foreign policy goals in the region, particularly so when the Attack occurred.

Following the Coalition invasion of Afghanistan in 2001, the Taliban led a terrorist syndicate that was focused on committing attacks against American, Coalition, and Afghan forces throughout the country. *Id.* at 14. That syndicate included the Taliban's own members, but also other similarly aligned groups such as Al Qaeda. *Id.* Iran aided that syndicate in a wide variety of ways, including the provisions of weapons, explosives, training, equipment, and safe haven. *Id.* at 22. Specifically, that training included instruction on "the use of mortars and rockets, small unit tactics, and IED manufacturing and employment techniques." *Id.*

Iran assisted the Taliban with establishing command centers both inside Afghanistan and within Iran. *Id.* at 22–23. Iran sent its Islamic Revolutionary Guard Corps forces to these command centers to assist with implementing strategy and trainings, both in a general sense and with regards to specific attacks. *Id.* at 23. Herat, the province where the Attack took place, borders Iran. *Id.* at 27. A porous border between the countries allowed for the free flow of "fighters, opium, and military munitions . . . amplifying both the Iranian and Taliban presence," *id.*, and increasing the lethality of Taliban attacks in the region.

### B.  **The Attack**

The Victim Plaintiffs and the rest of their team departed Camp Milam to begin a counter-insurgency mission on the evening of August 15, 2009. *See id.* at 61. The purpose of the mission was to intercept ongoing Taliban efforts to disrupt the upcoming Afghan elections. *Id.* The team met resistance and exchanged weapons fire with multiple Taliban fighters. *Id.* After completing

their immediate mission, the team decided to return to Camp Milam. *Id.* The convoy departed down a narrow road, which was the only route out of the village. *Id.*

The Victim Plaintiffs were riding in the sixth vehicle out of eight in the convoy. Affidavit of Marc Laliberte ("Exhibit 3") ¶ 10. Johnny and Marc were riding in the bed of the vehicle, while Jason rode in the turret. Affidavit of John J. Stanz ("Exhibit 2") ¶ 5. At approximately 3:45am local time on August 16, 2009, an explosive device detonated underneath their vehicle, throwing it high into the air, flipping it upside down, and consuming it in flames. *Cabrera*, ECF No. 59-3 at 61. The Victim Plaintiffs were each violently thrown from the vehicle, ultimately saving their lives, but causing severe injuries. Ex. 2 ¶ 6; Ex. 3 ¶ 12; Affidavit of Jason Roberts ("Exhibit 4") ¶ 7. Following the blast, enemy forces renewed their attacks against the convoy, but those attacks were eventually repelled enough for the Victim Plaintiffs to be transported to the Spanish hospital at Herat airfield for emergency medical treatment. *Cabrera*, ECF No. 59-3 at 61.

## VI.    JURISDICTION

### A.    Subject Matter Jurisdiction

A federal district court has subject matter jurisdiction over "any nonjury civil action against a foreign state," so long as one of the FSIA's enumerated exceptions to sovereign immunity apply. *See* 28 USC § 1330(a). In this case, Iran is subject to suit under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A, which confers jurisdiction against a foreign government if: (1) the claim is brought against a designated "State Sponsor of Terrorism"; (2) the attack victims are nationals, members of the United States armed forces, or employees of the United States; and (3) money damages are sought for personal injury or death caused by an act of

torture, extrajudicial killing, or hostage taking, or the material support of such acts. 28 USC §1605A(a)(1)–(2).[3] The first two elements are straight-forward.

Regarding the first element, the Court may take judicial notice of Iran's status as a designated State Sponsor of Terrorism, both at the present time, and when the cause of action arose. *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984).[4] Consideration of those public records alone is sufficient to prove this element. *See, e.g.*, *Hamen*, 401 F. Supp. 3d at 100 (noting that Iran has been designated since 1984, and that "[t]his long-standing designation of Iran as a state-sponsor of terrorism is sufficient to satisfy the designation requirement").

Similarly, the second element is easily established. All three of the Victim Plaintiffs are American citizens and were serving as members of the U.S. armed forces at the time of the Attack. Ex. 2 ¶¶ 1–3; Ex. 3 ¶¶ 1, 3–4; Ex. 4 ¶¶ 1–3.

To establish the third element, Plaintiffs must present evidence of: (a) an act of extrajudicial killing; (b) committed with the aid of material support from Iran; and (c) that resulted in death or serious personal injuries. Here, all three of those criteria are met.

### i.        The Attack was an act of extrajudicial killing.

The FSIA's terrorism exception defines an extra-judicial killing by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). The TVPA provides that an "extrajudicial killing" is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102–256, § 3(a), 106 Stat. 73.

---

[3] Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran.

[4] U.S. Department of State, *State Sponsors of Terrorism*, https://bit.ly/3LGVGBZ (last visited March 20, 2026).

Here, the Attack caused the death of at least two individuals. *Cabrera*, ECF No. 59-3 at 61. In doing so, the Taliban acted "deliberately," with "careful consideration," and "not on a sudden impulse" in its planning and execution of the Attack. *See Hamen*, 401 F. Supp. 3d at 101–02 (internal citations omitted) (finding that the exception does not require participation of a state actor, only that "a state actor provided material support for an extrajudicial killing committed by a nonstate actor"). This is demonstrated by the fact that the explosive device was buried, in anticipation of a future attack, along with coordinated small arms attacks. Finally, the Attack was clearly "not authorized by a previous judgment by a regularly constituted court," nor "lawfully carried out under the authority of a foreign nation." *See* TVPA, § 3(a).

Therefore, the Attack was clearly an act of extrajudicial killing.

### ii. Iran's provided material support and resources to the Taliban.

The state-sponsored terrorism exception to the FSIA looks to 18 U.S.C. § 2339A(b)(1)) to define "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Hamen*, 401 F. Supp. 3d at 103 (quoting 18 U.S.C. § 2339A(b)(1)).

Iran has a longstanding and well-establish history of providing this type of material support to the Taliban as part of its attempts to expel Western forces from the region and assert its own regional dominance. *See, e.g.*, *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 61 (D.D.C. 2021); *Cabrera*, 2022 WL 2817730, at *7; *M.M. v. Islamic Republic of Iran*, 708 F.

Supp. 3d 22, 43 (D.D.C. 2023); *Kenny v. Islamic Republic of Iran*, Case No. 1:22cv3299, 2024 WL 4297682, at *3 (D.D.C. Sept. 26, 2024).

As described above, Iran aided the Taliban and its terrorist syndicate in a wide variety of ways that would each satisfy the relevant definition of "material support." *Cabrera*, ECF No. 59-3 at 22. Direct training on "the use of mortars and rockets, small unit tactics, and IED manufacturing and employment techniques" is of particular relevance to the case at bar. *Id.* While assistance with establishing command centers was critical to carrying out complex attacks requiring organization, planning, and intelligence. *Id.* at 23.

While such consistent and pervasive material support leading up to the Attack would be sufficient on its own to establish this second element, Plaintiffs here also offer more specific evidence, through the expert testimony of Mr. Barker, that goes directly to the planning and execution of the Attack. Such evidence will be described below, as it directly relates to the proximate cause element.

### iii.    Iran's material support of the Taliban was a proximate cause of the Attack.

The FSIA's terrorism exception requires a showing of "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021) (citing *Owens,* 864 F.3d at 798). A "reasonable connection" is established where two factors are met: (1) "the defendant's actions [were] a substantial factor in the sequence of events that led to [their] injury," and (2) where the injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id*. The FSIA does not require "careful bookkeeping" of the use of specific material support, so long as a plaintiff demonstrates that financial and military aid to the terror group "played a significant role in aiding its operational capacity." *Id*. (citing *Schwartz v. Islamic*

10

*Republic of Iran*, Case No. 1:18cv1349 (RDM), 2020 WL 7042842, at *14 (D.D.C. Nov. 30, 2020)).

Donald Wade Barker has provided testimony on the issues of material support and proximate cause. *See* Expert Affidavit of Donald Wade Barker ("Exhibit 1"). Mr. Barker served for a lengthy and distinguished career in the United States Army, developing particular expertise regarding the use of, and defense against, explosive devices by insurgents in Iraq and Afghanistan. *Id.* ¶¶ 1–2. He furthered that expertise after his time in the military and serves now as the CEO and Chief Engineer of Evans Research and Development. *Id.* ¶¶ 3, 6. Mr. Barker has qualified and testified as an expert witness on similar cases at least eight times before. *Id.* ¶¶ 8–10. Plaintiffs offer Mr. Barker to the Court as an expert on the supply, distribution, and use of explosive devices in Afghanistan during the relevant timeframe.

In sum, after reviewing the available evidence and testimony regarding the Attack, Mr. Barker concluded that this bombing was "the direct and proximate result of material support and resources provided to the Taliban by Iran." *Id.* ¶ 25. He reached this conclusion based primarily on four factors: 1) the placement of the bomb; 2) the nature and components of the explosive device; 3) the location of the Attack; and 4) the timing of the Attack. *Id.* ¶ 24.

First, Mr. Barker examined the evidence regarding the specific placement and installation of this explosive device. It was placed on a narrow road, which was the only exit pathway for the convoy based on where they met resistance earlier in the evening. *Id.* ¶ 15. The device, which was very large, was buried underground, meaning it had to be placed well in advance of this convoy's arrival. *Id.* ¶¶ 19–20. In retrospect, these facts mean that the Taliban insurgents were supported with significant advanced intelligence and strategic planning to ensure that the bomb placement and the firefights were coordinated to lead the convoy over this specific route,

guaranteeing maximum damage. *Id.* ¶ 24(a). These details, according to Mr. Barker, are indicative of "direct Iranian involvement." *Id.* In *Cabrera*, LTC Wood echoed this same point, concluding that this level of strategy and planning "indicates readiness and sophistication beyond the proficiency of a typical Taliban unit." *Cabrera*, ECF No. 59-3 at 58.

Second, Mr. Barker examines the components of the explosive device used to injure the Victim Plaintiffs. Based on the available evidence, Mr. Barker concluded that the device was a VOIED, meaning a Victim Operated Improvised Explosive Device, with a dual initiation mechanism. Ex. 1 ¶ 17. With this initiation system, the device would lay dormant until it was activated, an important feature for ensuring that the detonation would not be triggered by someone other than the intended target. *Id.* ¶ 19. Once armed, the next vehicle to drive over the device would trigger the explosion. *Id.* ¶ 20. Here, since the Victim Plaintiffs were located in the sixth vehicle of an eight-vehicle convoy, it is highly likely that the device was armed remotely as the convoy exited the area. Mr. Barker concludes that the "level of electrical engineering capabilities" necessary for carrying out this Attack "was beyond the tactical capabilities of the Taliban in 2009 without the active assistance of a state sponsor." *Id.*

Third, Mr. Barker points to the geographic location of the Attack as highly suggestive that any outside assistance to the Taliban would have been reliant upon support from Iran. *Id.* ¶ 21. The Attack took place in the Herat Province, which borders Iran. *Id.* At that time, it is Mr. Barker's opinion that this portion of the Iranian border was extremely "porous" and the area was rife with Iranian activity. *Id.* LTC Wood agreed, concluding "that Iranian activity in Herat Province included direct sponsorship, training and supply to major Taliban activity at the time of this attack." *Cabrera*, ECF No. 59-3 at 63.

Fourth and finally, Mr. Barker finds "the timing of the Attack" to be "highly relevant." Ex. 1 ¶ 22. Based on the evidence, it is Mr. Barker's understanding that Taliban activity in this area was targeted at disrupting upcoming Afghan national elections. *Id.* That goal, according to Mr. Barker, is consistent with Iranian strategic goals in Afghanistan at that time and therefore "represents the type of operation that the IRGC would be likely to directly support." *Id.* ¶ 24(d).

Based on this evidence, and supported by the expert opinions of Mr. Barker and LTC Wood, Plaintiffs ask this Court to find that the material support and resources Iran provided to the Taliban was a proximate cause of the Attack.

### iv.    The Attack resulted in death and personal injury.

Two individuals were killed in the Attack. *Cabrera*, ECF No. 59-3 at 61. The Victim Plaintiffs were each thrown from their vehicle and suffered severe physical injuries. *See, e.g.*, Ex. 2 ¶ 6; Ex. 3 ¶ 12; Ex. 4 ¶ 7. These damages are sufficient to satisfy this element.

In sum, Plaintiffs have shown all the necessary elements to establish a waiver of Iran's sovereign immunity for a suit arising out of the attacks at issue in this case. Namely, that (1) Iran is a designated state sponsor of terrorism; (2) the Victim Plaintiffs are American citizens; and (3) Iran's material support to the Taliban was a proximate cause of the Victim Plaintiffs' severe personal injuries. Accordingly, this Court may exercise subject matter jurisdiction over the claims asserted herein.

### B.    Personal Jurisdiction

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for satisfaction

of the first element. The second element for personal jurisdiction is also satisfied because the defendant was properly served, as described fully below.

Title 28, Section 1608 prescribes the four methods of obtaining proper service in FSIA cases. *See* U.S.C. § 1608(a)(1)–(4). These methods must be attempted in ascending order, but only to the extent that each is feasible in a specific case or applicable to a specific defendant. *Id.* The first two methods of service under Section 1608—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention," respectively—do not apply here, as Plaintiffs have no "special arrangement" for service with Iran, and Iran is not a party to "any applicable international convention on service of judicial documents." *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 69 (D.D.C. 2010); *Schwartz*, 2020 WL 7042842, at *15. Plaintiffs therefore proceeded with the next two steps, by mail under 28 U.S.C. § 1608(a)(3), and then diplomatic service via the U.S. Department of State pursuant to 28 U.S.C. § 1608(a)(4).

Plaintiffs initiated the third method of service, a foreign mailing, on March 6, 2025, ECF No. 6. After waiting the requisite thirty days, ECF No. 9, Plaintiffs initiated the final method of service, in accordance with 28 U.S.C. § 1608(a)(4), on April 15, 2025, ECF No. 10. The Clerk transmitted those documents to the State Department for service through diplomatic channels. ECF No. 12. On February 17, 2026, the State Department confirmed that the Iranian Ministry of Foreign Affairs was served with the pleadings on December 21, 2025. ECF No. 16.

Based on the foregoing, Iran is outside the protection of sovereign immunity, and Plaintiffs have fully complied with the service requirements of Section 1608(a). With those two elements satisfied, this Court may properly exercise personal jurisdiction over Iran in this matter. *See* 28 USC § 1330(b).

## VII.    THEORIES OF LIABILITY

With jurisdiction established, liability in FSIA cases may be determined in a variety of ways. Originally, the FSIA was not interpreted to create a federal cause of action, but rather to operate as a "pass-through" for state law claims. *See Owens*, 864 F.3d at 763; *Cicippio-Puelo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). However, the FSIA was then amended in 2008 to explicitly authorize the federal cause of action now found in Section 1605A(c). But this amendment "did not upset the prior law permitting plaintiffs to assert state law claims after clearing the hurdle of foreign sovereign immunity." *Fritz*, 320 F. Supp. 3d at 89 (citing *Owens,* 864 F.3d at 807–09); *see W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) ("the creation of a federal cause of action in § 1605A(c) did not revoke Plaintiffs' ability to recover pursuant to state law causes of action").

Therefore, once jurisdiction is established under 28 U.S.C. § 1605A(a), plaintiffs may pursue either the federal cause of action or any relevant state law causes of action. The appropriate method to apply often depends on the status and nationality of each individual plaintiff. Here, all but one of the Plaintiffs is a U.S. citizen whose claims will be addressed through the federal cause of action established by Congress in 28 U.S.C. § 1605A(c). For Betsy Laliberte, who is a Canadian citizen, Plaintiffs look to other causes of action.

### A.    Iran is Liable to the U.S. Citizen Plaintiffs under 28 U.S.C. § 1605A(c).

"There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity." *Fritz*, 320 F. Supp. 3d at 86–87, *quoting Foley v. Syrian Arab Republic,* 249 F. Supp. 3d 186, 205 (D.D.C. 2017). A plaintiff who proves the waiver requirements of 28 U.S.C. §1605A(a) and is a U.S. national, military member,

or government contractor at the time of the terrorist act, "has also established entitlement to relief as a matter of federal law." *Fritz,* 320 F. Supp. 3d at 87.

Put differently, "the elements of immunity and liability . . . are essentially the same." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 54 (D.D.C. 2018) (quoting *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010)). Therefore, because Plaintiffs (with the exception of Betsy Laliberte) were American citizens at the time of the Attack, they are entitled to federal statutory liability as a matter of law.

Although meeting the elements laid out in 1605A(c) has been held to be sufficient to establish liability under the federal cause of action, some courts have also further analyzed these claims in light of the elements of basic common law torts. Should the Court wish to proceed in that manner here, the facts alleged clearly meet common law tort theory standards for assault, battery, and intentional infliction of emotional distress.

i.    Assault

A defendant is liable for assault when it acts "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact with those attacked and those attacked were thereby put in such imminent apprehension." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 80 (D.D.C. 2017) (quoting RESTATEMENT (SECOND) OF TORTS § 21(1)) (internal quotation marks omitted). In *Braun*, the Court considered assault in the context of acts of terror, finding that the very definition of terrorism involved "the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal." *Id.* (citing Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/ terrorism). This, combined with the plaintiff's averment in *Braun* that "she felt and continues to

feel anxiety as a result of the [bombing] attack," was enough to satisfy the Restatement elements for assault. *Id.*

Here, Iran's material support and training for the Taliban, and the very nature of the Attack, clearly exemplify the desire to "cause harmful or offensive contact" to the Victim Plaintiffs. *See id.* Therefore, the Victim Plaintiffs' claims would succeed under the general principles of tort law for a claim for assault.

### ii. Battery

A claim for battery is similar to one for assault, except that "a harmful contact" must "directly or indirectly result[]." *Braun*, 228 F. Supp. 3d at 80 (quoting RESTATEMENT (SECOND) OF TORTS § 13). Something amounts to "harmful contact" when it results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 15). Because the Attack physically injured the Victim Plaintiffs, a "harmful contact" is clearly established, qualifying the Victim Plaintiffs to pursue this 1605A(c) claim under a battery theory.

### iii. Intentional Infliction of Emotional Distress

A defendant is generally liable for intentional infliction of emotional distress if it, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to the plaintiffs." *Braun*, 228 F. Supp. 3d at 81 (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)) (internal quotation marks omitted). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F.Supp.2d 8 (D.D.C.2009). By the same token, providing material support by means of weapons, funding, and training, particularly to an organization like the Taliban, is also extreme and outrageous. *See Braun*, 228 F. Supp. 3d at 81

(defendants conduct in materially providing support to a terrorist organization was "sufficiently outrageous and intended to inflict severe emotional harm"). Moreover, these acts did in fact cause severe emotional distress to Plaintiffs, as described in great detail below. *See supra* Sec. VII.B. Therefore, Plaintiffs may proceed under the general tort principles that underlie a claim for intentional infliction of emotional distress.

Because Plaintiffs' claims meet the three basic elements required for recovery under Section 1605A(c), and their claims can be expressed consistently with accepted principles of common law torts for assault, battery, and intentional infliction of emotional distress, the Court should find in their favor as to liability.

### B.    Iran is Liable to Betsy Laliberte under D.C. Law

The lone foreign citizen family member in this case, Betsy Laliberte, is the mother of Marc Laliberte. Affidavit of Betsy Laliberte ("Exhibit 16") ¶¶ 1–2. She is a citizen of Canada. *Id.* As discussed above, a victim's family member who is not an American citizen, and who therefore cannot pursue a claim under Section 1605A(c), may still assert claims under some other applicable law. *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 46 (D.D.C. 2020).

In such circumstances, this Court must first determine what substantive law applies. Possible options include the place where the attacks occurred (Afghanistan), the domicile of the various individual plaintiffs at issue (Canada), or the forum (District of Columbia). That ultimate determination is accomplished by applying the choice of law rules of the forum state. *Oveissi v. Islamic Republic of Iran,* 573 F.3d 835, 840 (D.C. Cir. 2009); *Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 153–154 (D.D.C. 2011), *aff'd in part and vacated in part on other grounds,* 864 F3d 751 (D.C. Cir. 2017).

The District of Columbia blends a "governmental interest analysis" with a "most significant relationship test." *Fritz,* 320 F. Supp. 3d at 89 (quoting *Oveissi,* 573 F.3d at 842). Under the governmental interest analysis, this Court should evaluate "the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co., Ltd. V. Shama Rest. Corp.,* 566 A.2d 31, 40–41 (D.C. 1989) (quoting *Kaiser–Georgetown Community v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985)).

The "most significant relationship test" requires this Court to consider four factors set forth in the Restatement (Second) of Conflict of Laws: (1) "the place where the injury occurred;" (2) "the place where the conduct causing the injury occurred;" (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties;" and (4) "the place where the relationship, if any, between the parties is centered." *Id.* at 42 (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)). Consideration is also given to the needs of international systems, the relevant policies of the forum, predictability, certainty and uniformity of result, and ease in the determination and application of the law to be applied. *Dammarell v. Islamic Republic of Iran,* No. CIV.A. 01-2224 (JDB), 2005 WL 756090 at *18 (D.D.C. Mar. 29, 2005); *Fritz,* 320 F. Supp. 3d at 90. But, as a general rule for FSIA cases, the law of the forum governs "unless the foreign state has a greater interest in the controversy." *Owens*, 826 F. Supp. 2d at 154.

Courts of this District have previously applied District of Columbia law in this same context. For example, in *W.A.*, the Court listed several reasons why the United States had a "unique interest" in "having its own laws apply in litigation involving acts of terrorism." *W.A.*, 427 F. Supp. 3d at 139. Because the acts of terrorism at issue were designed to "weaken United

19

States' interests and policies abroad," the court held that "the law of the forum state, the District of Columbia, should provide the rule of decision" so as to (1) promote uniformity of law, and (2) to "extend access to U.S. federal courts" for foreign citizen family members of victims of terrorism. *Id.*

Similarly, in *Owens*, the court applied D.C. law rather than the law of the countries where the U.S. embassy bombings occurred, finding that the United States had a "unique interest" in having its domestic law apply in terrorism cases, especially those directed against American interests. 826 F. Supp. 2d at 155. Similarly, in *Dammarell*, this Court applied D.C. law in a case involving an attack on the U.S. Embassy in Beirut. 2005 WL 756090, at *18. And in *Fritz*, this Court emphasized the same "unique interest" of the United States and concluded that "the seat of the federal government" should provide the substantive law. 320 F. Supp. 3d at 91.

For the same reasoning, this Court should apply D.C. law to Betsy Laliberte's claim.

District of Columbia law provides a cause of action for foreign family member plaintiffs that is the functional equivalent of the solatium damages available under 28 U.S.C. § 1605A(c). This principle was specifically affirmed upon a certified question to the D.C. Court of Appeals. *Republic of Sudan v. Owens,* 194 A.3d 38, 42 (D.C. 2018). To establish a *prima facia* case of intentional infliction of emotional distress under D.C. law, a plaintiff must establish: (1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) caused the plaintiff to suffer severe emotional distress. *Larijani v. Georgetown Univ.,* 791 A.2d 41, 44 (D.C. 2002).

First, acts of terrorism, "by their very definition," amount to extreme and outrageous conduct. *Valore,* 700 F. Supp. 2d at 77 (D.D.C. 2010); *Mwila v. Islamic Republic of Iran,* 33 F. Supp. 3d 36, 40 (D.D.C. 2014). Second, as set forth above, Iran and the Taliban's conduct

exhibited a purposeful and intentional support for violence. Finally, the Attack caused Betsy Laliberte understandably severe emotional distress as she dealt with the changes in her son who had served as her caretaker prior to his injuries. *See* Ex. 16 ¶ 11.

Accordingly, Betsy Laliberte has a valid cause of action under D.C. law for intentional infliction of emotional distress, which is functionally equivalent and comparable to the solatium claims available to the other family member plaintiffs.

## VIII.  DAMAGES

The FSIA terrorism exception specifies that Plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). In *Valore*, this court confirmed that "those who survived the attack can recover damages for their pain and suffering, as well as any other economic losses caused by their injuries . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." 700 F. Supp. 2d at 83. Each of these types of recovery will be addressed below.

### A.    Pain and Suffering

Awards for pain and suffering "are determined based upon an assessment of such factors as to the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Winternitz v. Syrian Arab Republic*, Case No. 1:17cv2104, 2022 WL 971328, at *10 (D.D.C. Mar. 31, 2022) (citing *Valore*, 700 F. Supp. 2d at 83–84). For individuals who survive terrorist attacks, courts have adopted a baseline award of $5 million. *Id*. (indicating that this baseline has been applied to injuries ranging from broken bones to "lasting and severe psychological harm").

That baseline figure "may be moderated either upward or downward" based on the severity of the injuries. *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 40 (D.D.C. 2018).

21

In particular, an upward departure to a range of "$7.5-$12 million" is considered appropriate "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Valore*, 700 F. Supp. 2d at 84. Whereas downward departures are applied "where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Id.* As shown below, the severe physical injuries suffered by the three victims in this case each support the application of an upward departure.

### i.    Pain and Suffering of John J. Stanz

Johnny was riding in the bed of the vehicle at the time of detonation. Ex. 2 ¶ 5. He, along with the burning vehicle, was launched approximately seventy-five feet forward by the blast. *Id.* Knocked unconscious by the force of the blast, Johnny remained in a coma for the next fifty-two days. *Id.* Initially, his physicians informed the family that he was unlikely to wake up, or that if he did, that he would require constant life-long nursing care. Affidavit of Tara Archfield ("Exhibit 9") ¶ 14. During his initial recovery phase, Johnny's siblings would help him with all basic needs, including showers and using the bathroom. Affidavit of Stacy Waite ("Exhibit 7") ¶ 19; Affidavit of Amy Pavlovich ("Exhibit 8") ¶ 16. Johnny would sometimes yell at his family to "get down and not move before 'they' were coming." Ex. 8 ¶ 17. After waking up from his lengthy coma, he had to relearn everything from walking, eating, and using the bathroom. Ex. 7 ¶ 18.

Despite making a better-than-expected physical recovery, Johnny still struggles with a wide variety of physical and emotional difficulties today. He deals with bouts of incontinence and erectile dysfunction. Ex. 2 ¶ 16. The use of his left arm and right leg is compromised. *Id.*

Moreover, the effects of his traumatic brain injury ("TBI") and post-traumatic stress disorder ("PTSD") are pronounced. Angry outbursts or inappropriate comments have damaged many of the family relationships that Johnny held most dear. *Id.* ¶¶ 18–21. He regularly struggles to feel whole. *Id.* ¶¶ 22–24. His siblings describe someone who used to be the center of a tight-knit family who now picks fights and causes trouble, even among those he cares for the most. Ex. 7 ¶¶ 25–27.

Given the severity of his physical injuries, the difficulty of his recovery, and the ongoing disruption to his daily life and relationships, Plaintiffs suggest an upward departure pain and suffering award of $10,000,000 for Johnny.

### ii.      Pain and Suffering of Marc Laliberte

Marc Laliberte was thrown approximately 100 feet by the force of the blast from the Attack. Ex. 3 ¶ 12. He woke up briefly to the sound of gunfire, could barely move, and then passed out. *Id.* ¶ 13. He recalls waking up next at the field hospital. *Id.* From the force of the explosion, Marc sustained fractures in his "face, head, left wrist, right shoulder, and left hip." *Id.* ¶ 15. He had severe injuries to his right index finger that, at one point, appeared likely to require amputation. Affidavit of John Laliberte ("Exhibit 17") ¶ 8.

Marc suffered burns across forty percent of his body. Ex. 3 ¶ 15. During his recovery, he would undergo skin grafts over about one-third of the burns. *Id.* He also required jaw surgery and a dental procedure to replace nine teeth. *Id.* ¶ 17. All told, Marc required four months in the hospital for these procedures and the related recovery periods. *Id.* ¶ 16. Even after release from the hospital, Marc has continued to undergo procedures and therapy aimed at minimizing the appearance and effect of the scar tissue. *Id.* ¶ 19. But regardless, he will never look or feel the same as he did before the Attack. *Id.*

Marc describes his emotional trauma as making him "callous and numb" and impacting his ability to connect with his loved ones. *Id.* ¶ 22. The most painful result of this was a loss of closeness to his wife and children, eventually leading to a long-distance separation and divorce. *Id.* ¶¶ 23–25. He also describes a similar loss of closeness with his mother, Betsy, as a direct result of the trauma he experienced and the difficulty of his recovery. *Id.* ¶ 26.

Given the severity of his physical injuries, in particular the severe burns across forty percent of his skin area, and the ongoing emotional trauma causing disruption to his family relationships, Plaintiffs suggest an upward departure pain and suffering award of $8,000,000 for Marc.

### iii.    Pain and Suffering of Jason Roberts

Jason Roberts was thrown clear by the blast and rendered unconscious. Ex. 4 ¶¶ 7–8. He woke up approximately thirty minutes later and immediately noticed that his "left leg was severely injured and disfigured." *Id.* ¶ 8. Through severe pain, Jason managed to crawl himself to safety before a teammate treated his wounds and assisted with his evacuation. *Id.* In addition to his leg injury, Jason also suffered a fractured pelvis, scapula, nose, lumbar vertebrae, and ribs. *Id.* ¶ 10. While those other injuries healed with time, albeit painfully, his left leg was amputated below the knee. *Id.*

Jason remained hospitalized for over eight months. *Id.* ¶ 11. When he re-entered normal life, things were completely changed due to his injuries and his new physical limitations. *Id.* ¶¶ 13–14. He requires physical assistance from his wife for many daily activities, and is constantly encountering ways that his leg amputation has changed how he goes about his life and is perceived by others. *Id.* Among other life changes brought about because of these challenges, Jason and his wife decided not to have children. *Id.* ¶ 18.

24

He also experiences emotional and psychological effects of this trauma, including hypervigilance and disconnection. *Id.* ¶¶ 15–16. For example, Jason prefers to avoid large crowds and will never sit with his back to a door when he's in public. *Id.* Much like his daily activities, normal social interactions with friends and family are more difficult for him. *Id.*

Given the severity of his physical injuries, specifically the amputation of his left leg, and the ongoing physical and emotional trauma impacting his daily life, Plaintiffs suggest an upward departure pain and suffering award of $10,000,000 for Jason.

### B.      Solatium Damages

Each family member advances either a solatium claim pursuant to Section 1605A(c) or, in the case of Betsy Lalibete, an equivalent state law cause of action for intentional infliction of emotional distress. Those "in direct lineal relationships are presumed to suffer damages for mental anguish insofar as '[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.'" *Bova v. Islamic Republic of Iran*, Case No. 1:15cv1074, 2020 WL 2838582, at *6 (D.D.C. May 31, 2020) (quoting *Belkin*, 667 F. Supp. 2d at 22). These damages are not easily quantifiable, so "Courts look for guidance, therefore, in prior decisions." *Id.*

Solatium claims are generally defined as compensation for "mental anguish, bereavement and grief." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011). A solatium claim is "nearly indistinguishable from a claim for IIED." *Flanagan*, 87 F. Supp. 3d at 115. This Court utilizes a framework for calculating such damages that suggests baseline awards of four million for spouses, two and a half million for parents and children, and one and a half million for siblings. *Oveissi*, 768 F. Supp. 2d at 26 n.10; *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010).

25

Although this framework is widely recognized as the presumptive approach, its suggested figures "are not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). This Court has discretion "to grant [higher or lower] solatium awards based on the particular facts of each case." *Blank v. Islamic Republic of Iran*, Case No. 1:19cv3645 (BAH), 2021 WL 3021450, at *12 (D.D.C. July 17, 2021) (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 351 (D.C. Cir. 2018)). The Court should award more in cases "with aggravating circumstances," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006), such as "an especially close relationship" with the victim, "medical proof of severe pain, grief or suffering on behalf of the claimant," or if the circumstances of the attack made the plaintiffs' "suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

Plaintiffs present the following facts, drawn from the sworn affidavits of the family members of the Victim Plaintiffs, and request appropriate awards of solatium damages.

### i.    The Family of John J. Stanz

#### a.    *John C. Stanz*

John C. Stanz is the father of Johnny. Affidavit of John C. Stanz ("Exhibit 5") ¶ 2. John and Johnny had an outstanding father son-relationship built on honestly, openness, complete trust, and a shared faith in God. *Id.* ¶ 4. Throughout Johnny's life, he and his father did everything together—sports, Boy Scouts, and annual hunting camps. *Id.* ¶ 5. Johnny would drop everything to help his father, even spending time with his friends. *Id.* ¶ 7.

The entire family was proud of Johnny when he enlisted in the Marine Corps. His father believed deep down that Johnny would be safe when he was overseas, that he would return home the same way he left. *Id.* ¶ 10. John's world came crashing down when he realized he was

mistaken. *Id.* Within twenty-four hours, John learned that his wife was in the hospital and his son was severely injured. John learned about Johnny's injuries while on an out-of-town work trip. *Id.* ¶ 8. He was returning home to be with his wife in the hospital, who had suffered an unexpected heart attack when he got the call about Johnny. *Id.* Soon after the initial call, John and his family flew to Germany to say goodbye to Johnny. *Id.* ¶ 11. Fortunately, that visit was not a goodbye; however, Johnny did not come home the same. *Id.* ¶ 10.

John and his wife quit their jobs after Johnny returned to the United States to be at his bedside every moment throughout his coma and recovery. *Id.* ¶ 12. When Johnny was able to return home, he moved in with John and his mother, who continued to care for him. The hardest part for John was that he lost the real Johnny. *Id.* ¶ 16. John watched his once close family begin to crumble.

John's wife's health spiraled once they received the news about Johnny. *Id.* ¶ 8. She was diagnosed with Parkinson's disease and deteriorated rapidly as she committed herself to caring for Johnny while battling her own illness. Affidavit of Cassie Stronz ("Exhibit 10") ¶ 12. John's wife died in 2024. *Id.* Additionally, John watched his children's relationships fracture because Johnny could not control his actions or words. Ex. 5 ¶¶ 12, 13, 15. The most painful relationship that changed was Johnny's relationship with his brother Joey. *Id.* ¶ 15. John could do nothing as his sons went from each other's Best Men and the godfathers of each other's children to no longer speaking to one another. *Id.*

Johnny's injuries are especially challenging for "those . . . who love him and knew the real Johnny before this ordeal." *Id.* ¶ 16. John continues to suffer as he cares for Johnny and tries to hold the family together. Given the devastating effects of Johnny's injuries on John's life and

27

the family relationships, Plaintiffs suggest that John be awarded solatium damages of $4,000,000, a 60% upward departure.

> ### b.    Lisa Destro

Lisa Destro is Johnny's older sister. Affidavit of Lisa Destro ("Exhibit 6") ¶ 2. The Stanz family had always been incredibly close. *Id.* ¶ 4. However, Lisa had a special relationship with Johnny because she never married and continued to live with her parents. *Id.* Because Lisa has some disabilities, she relied on her family, specifically Johnny, more than the rest of the siblings. *Id.* When everyone else moved out, Lisa spent time with Johnny, who made sure to include her in his plans and to go out with her for lunch or drinks. *Id.* ¶ 5. Lisa and Johnny spent a lot of one-on-one time together. *Id.* Lisa relied on Johnny for emotional and financial support. *Id.* ¶ 6. Whatever she needed anything, Johnny was always there for her. *Id.*

Lisa was away on her own for the first time when she learned about Johnny's injuries. *Id.* ¶ 7. Lisa's siblings called her friend first so she could help Lisa handle the news and her emotions. *Id.* This news came just after Lisa learned that her mother had suffered a heart attack. *Id.* Lisa began experiencing tremendous anxiety and panic attacks. *Id.* ¶ 8. Her experience was so severe that she began to take anxiety and depression medication, which she continues to take to this day. *Id.* ¶ 8. Lisa saw a counselor and psychiatrist to help her cope with the impact of Johnny's injuries on her life. *Id.* ¶ 9. She has stayed in mental health hospital on several occasions, sometimes as long as three weeks. *Id.*

Lisa's anxiety continued at home with Johnny. She "walked on eggshells" around him because he would "lash out and yell at [her] to leave constantly." *Id.* ¶ 10. Sometimes Johnny was so angry that Lisa "tried not to leave [her] room because [she] was scared." *Id.* Lisa struggled to watch her parents care for Johnny because it frequently led to fights and tears. *Id.*

¶ 11. Further, Lisa who laments her once close family that is now broken by fractured relationships. *Id.* ¶ 12.

Given the continued psychological distress of Johnny's injuries on Lisa, Plaintiffs suggest that Lisa be awarded $2,0000,000 in solatium damages, a 60% upward departure.

c.      Stacy Waite

Stacy Waite is Johnny's older sister. Ex. 7 ¶ 2. Stacy and Johnny were incredible close despite their twelve-year age difference. *Id.* ¶ 4. The Stanzes were an incredibly close family that did everything together—vacations, camping trips, and every holiday. *Id.* ¶ 5. Johnny was Stacy's kids' favorite because he took them on adventures, did fun activities with them, and attended all of their milestones, sporting events, and school plays. *Id.* ¶ 6. Johnny was a junior groomsman in Stacy's wedding and the godfather of her youngest son. *Id.* ¶ 7. Johnny was more than a brother and uncle; he was a "constant and loving presence in [their] lives." *Id.* He made sure to end every conversation with the words "I love you" because he believed you never knew when you might be speaking to someone for the last time. *Id.* ¶ 10.

Johnny worked hard to shield his family from the realities of the war so his family would not worry. *Id.* ¶ 9. This made the news even more difficult for Stacy. The day Stacy learned about Johnny's injuries, August 16, 2009, will always remain in her mind because that day was also her anniversary. *Id.* ¶ 11. Stacy was told Johnny would not make it, and she immediately wrestled with how to share that news with her hospitalized mother and her father who was out of town. *Id.* ¶ 12. Stacy then had to leave her husband and three young children to say goodbye to Johnny in Germany. *Id.* ¶ 13. She was "stressed, terrified, and overwhelmed." *Id.*

When Johnny returned to the United States, Stacy rotated along with her other siblings to ensure someone who loved Johnny would always be by his side. *Id.* ¶ 14. The family even spent

29

Thanksgiving together in Johnny's hospital room. *Id.* Stacy lived in constant fear that Johnny would never wake up from his coma. *Id.* Johnny did wake up from his coma once, only long enough to sit up, open his eyes, and begin to cry. *Id.* ¶ 16. Doctors informed Stacy this was a reflex and Johnny would likely never wake up, but Stacy was filled with hope, nonetheless. *Id.* With this hope, Stacy and her family committed hour upon hours researching and visiting rehabilitation centers to provide Johhny with the best care when he woke up. *Id.* ¶ 17.

Fifty-two days later, Johnny woke up for good. *Id.* ¶ 18. Stacy was confronted with her new brother, one who had to relearn to walk, eat, and go to the bathroom. *Id.* One who lost a lot of his memories. *Id.* One who would suddenly tell Stacy to "shut up, get on the ground, and stay down as if he was back in Afghanistan." *Id.* Stacy attended to Johnny's daily needs during his recovery. *Id.* ¶ 19. She gave him haircuts, showered him, took him to the bathroom and wiped him. *Id.* Johnny refused to let nurses help him, so his daily needs fell to Stacy and their family. *Id.*

Stacy struggled with anxiety, depression, panic attacks, and insomnia. *Id.* ¶ 20. She took anxiety medication for two years to cope with Johnny's recovery and injuries. *Id.* What was worst for Stacy was watching her children grapple with the grief of Johnny's injuries. *Id.* ¶ 21. Stacy's children saw their school psychiatrist to process their own grief and trauma. *Id.* One of Stacy's sons expressed his grief through drawings and once drew a picture of the family surrounding Uncle Johnny's hospital bed. *Id.* Stacy fought to stay strong for her kids as she "battled [her] own fear, grief, anger, and anxiety." *Id.* ¶ 22.

Over time, supporting Johnny took a toll on Stacy's family financially and relationally. *Id.* ¶¶ 23, 25. Stacy spent a large amount of money travelling to be with Johnny and paying for

30

childcare. *Id.* ¶ 23. The most heartbreaking new reality are the relational riffs in the Stanz family. *Id.* ¶¶ 25–30. Stacy no longer feels comfortable leaving her children alone with Johnny. *Id.* ¶ 27.

His injuries have "affected every part of [their] lives. What happened to Johnny did not just affect him, it has permanently changed all [their] lives." *Id.* ¶ 30. Given the long term emotional and relational trauma Stacy experiences, Plaintiffs suggest she be awarded $2,0000,000 in solatium damages, a 60% upward departure.

> d.    *Amy Pavlovich*

Amy Pavlovich is Johnny's older sister. Ex. 8 ¶ 2. Johnny was a junior groomsman in Amy's wedding, and her kids called him "The Fun Uncle." *Id.* ¶ 7. When Johnny left to join the Marine Corps, Amy was afraid, but she was even more proud. *Id.* ¶ 5. Amy and Johnny checked in with each other every couple weeks while he was at boot camp. *Id.* ¶ 6. Amy described Johnny as a jokester who turned "even the hardest parts of his deployment into a joke to make sure [she] did not worry." *Id.* ¶ 8.

Amy received a phone call from her mother's nurse that Stacy needed to get to the hospital immediately. *Id.* ¶ 9. Initially, Amy assumed that her mother, who had suffered a sudden heart attack, had taken a turn for the worse. *Id.* When she arrived, she discovered the call was about the explosion and Johnny's injuries. *Id.* Amy's heart and mind raced as she asked endless questions: "Was Johnny alive? What happened? How bad is 'severely injured?'" *Id.* ¶ 10. Amy prepared to leave for Germany to say goodbye to her brother. *Id.* ¶ 11. That is when she started experiencing panic attacks, anxiety, and issues eating and sleeping. *Id.* ¶ 13. Amy started checking her phone incessantly so she would never miss a call or update, a habit she continues to this day leaving her phone on her bedside table with the ringer always on. *Id.* ¶ 14.

31

Amy took turns making the six-hour drive to Bethesda to be with Johnny. *Id.* ¶ 15. This continued for weeks until Johnny woke up. *Id.* Once Johnny woke up, he relied on Amy to help him shower, go to the bathroom, and shave because he would not accept help from nurses. *Id.* ¶ 16. Amy felt like she was "in a warzone" when she was with Johnny, who often screamed at her to get down because "they" were coming. *Id.* ¶ 17. Those moments did not only happen in front of Amy but in front of her children, who were eight and four years old. *Id.* Amy struggled watching her children try to understand what happened to Uncle Johnny. *Id.* The kids were often afraid and regularly asked if Uncle Johnny would "ever be normal again." *Id.*

The day Amy learned about Johnny's injuries changed her life. *Id.* ¶ 10. She was gone helping Johnny and her parents which created tension at home with her husband and children. *Id.* ¶ 19. Amy's parents missed milestones in their grandchildren's lives because Johnny could not come to events with the for fear of him having an outburst. *Id.* Amy lost her brother on the day of the bombing. Given the ongoing loss Amy experiences of the brother she once knew and the emotion and psychological strain of caring for the "new" Johnny, Plaintiffs suggest Amy be awarded $2,0000,000 in solatium damages, a 60% upward departure.

e.    *Tara Archfield*

Tara Archfield is Johnny's older sister. Ex. 9 ¶ 2. Johnny was a groomsman in Tara's wedding and is the godfather of one of her sons. *Id.* ¶ 5. Johnny used to talk to Tara about travel, re-enlisting, and education decisions. *Id.* ¶ 6. Tara stayed in frequent contact with Johnny before and during his deployment. *Id.* ¶ 7.

Tara had recently returned home to Maryland from being with her family when she received the call about Johnny. *Id.* ¶ 8. The call came on the heels of the news that her mother had experienced a sudden heart attack. *Id.* Tara was newly married with an infant daughter and

had to scramble to get back home and ultimately travel to Germany to say goodbye to Johnny. *Id.* ¶¶ 8–9. She missed her daughter's first birthday to go see Johnny. *Id.* ¶ 9. Tara started experiencing anxiety and difficulty sleeping. *Id.* ¶¶ 9–10.

When Johnny returned to the United States, he was in Bethesda, Maryland, so Tara was the closest family member. *Id.* ¶ 11. Tara left her daughter and husband regularly to be with Johnny, and the time she spent with him during his coma was awful. *Id.* ¶ 12. Doctors told Tara and her family that Johhny would never wake up and that if he did wake up, he would need around-the-clock care. *Id.* ¶ 14. Once Johnny woke up and moved to a facility in Philadelphia, Tara planned weekly trips to support Johnny and her parents, which continued to create financial and relational difficulty for her young family. *Id.* ¶ 15. Tara was heartbroken watching her once strong brother be so helpless, and she realized that the conversations she used to have with Johnny about his future were likely over. *Id.* ¶¶ 16–17.

Tara and her family were never the same after the Attack. Johnny's injuries led to unpredictable behavior that constantly cause fights in the family. *Id.* ¶ 19. Tara's mom struggled emotionally, physically, and socially as she attempted to care for Johnny while battling her own illness. *Id.* ¶ 21. Tara's second child was born with several issues, and she "always wonder[s] if the stress on [her] body and mind during Johnny's recovery impacted [her] son's health." *Id.* ¶ 23. Tara's kids will never get to experience the fun Uncle Johnny that her nieces and nephews knew and loved. *Id.* ¶ 24.

To this day, Tara feels like she is always walking on eggshells as she navigates spending time with her divided family. *Id.* ¶ 28. Given the ongoing emotional and traumatic impact of the Attack of Tara's life, Plaintiffs suggest Tara be awarded $2,0000,000 in solatium damages, a 60% upward departure.

### f.    Cassie Stronz

Cassie Stronz is Johnny's younger sister. Ex. 10 ¶ 2. Cassie always looked up to Johnny and wanted to be like him. *Id.* ¶ 4. Johnny always included Cassie even though she was younger than him. *Id.* ¶ 5.

Cassie was recently engaged and planning a wedding when she learned about the Attack. *Id.* ¶ 8. She left behind her fiancé and put wedding planning on hold to say goodbye to Johnny in Germany. *Id.* Cassis was looking for a job at the same time and interviewed for a teaching position the day after she returned from Germany. *Id.* ¶ 9. She had an emotional breakdown during the interview, which prevented Cassie from obtaining that job or any other interviews in that school district. *Id.* Both her personal and professional life were put on hold.

Cassie struggled the most to watch the impact of Johnny's injuries on her mother, who quit her job, stopped spending as much time with her family and friends, and was later diagnosed with Parkinson's disease. *Id.* ¶ 12. Cassie is heartbroken that their "once strong sibling bond has been fractured by Johnny's injuries." *Id.* ¶ 13.

Given the long-term effects of Johnny's injuries on Cassie's mental and emotional health and family relationships, Plaintiffs suggest Cassie be awarded $2,0000,000 in solatium damages, a 60% upward departure.

### g.    Joseph Stanz

Joseph ("Joey") Stanz is Johnny's younger brother. Affidavit of Joseph Stanz ("Exhibit 11") ¶ 2. Johnny was more than a brother to Joey, he was a mentor, the person Joey could "turn to during times of uncertainty or hardship." *Id.* ¶ 5. Joey asked Johnny to be his best man before the Attack, and he "could not wait from [Johnny] to come home from his deployment to celebrate that milestone together." *Id.* ¶ 6.

Joey experienced "intense fear, anxiety, and anger" when he learned about the Attack. *Id.* ¶ 7. He feared Johnny would not make it or how much life would change if Johnny did survive. *Id.* Despite being the youngest member of the family, Joey stepped up for his family as they navigated the uncertainty of Johnny's injuries and recovery. *Id.* ¶ 8. Joey took on coordinating family communication, travel arrangements, and the rapidly changing information about Johnny's condition. *Id.* ¶ 10. Joey ultimately resigned from his job and postponed his wedding to support Johnny and his family. *Id.* ¶¶ 11, 14.

Joey was responsible for making medical decisions for Johnny while he was in the coma, and he was the one who flew alone with Johnny to ensure his body made it to the United States. *Id.* ¶ 12. Once Johnny returned to the United States, Joey moved from a different state to be closer to Johnny and his parents. *Id.* ¶ 14. Caring for Johnny resulted in significant financial strain on Joey, but the "most devastating impact" was the change on Johnny's "cognitive abilities and personality." *Id.* ¶ 15.

Joey and Johnny's relationship has largely been lost. *Id.* ¶ 15. The two brothers used to talk every day and spend time together frequently, and now they hardly speak to each other because Johnny cannot control what he does and says. *Id.* ¶ 16.

Joey was "permanently deprived of closeness with [his] brother" because of the Attack. *Id.* ¶ 17. Given that Joey lost his close relationship with his brother and the ongoing emotional and relational strain of Johnny's injuries, Plaintiffs suggest Joseph be awarded $2,250,000 in solatium damages, an 80% upward departure.

### ii.    The Family of Marc Laliberte

#### a.    *Juliette Laliberte*

Juliette Laliberte is Marc's ex-wife. Affidavit of Juliette Laliberte ("Exhibit 12") ¶¶ 2–3. At the time of the Attack, they had been married for about ten years and had two children together. Ex. 2 ¶ 6; Ex. 12 ¶ 5. Juliette describes the first decade of their marriage as "secure and confident." Ex. 12 ¶ 6. Marc was supportive and loyal throughout years of her struggles with infertility before James and H.L. were born. *Id.* ¶¶ 6–9. Being married to Marc "felt like a fairytale." *Id.* ¶ 5.

Juliette "felt physically sick" when she first heard about the bombing and she "could barely function for days." *Id.* ¶ 10. When Marc returned to the States, Juliette left home with a toddler and an infant to be with Marc during his recovery. *Id.* During that initial recovery period, Marc was unable to walk or feed himself, so Juliette had to be his full caregiver. *Id.* ¶ 12. She vividly recalls the sight of first seeing him wrapped from head to toe due to the burn injuries. *Id.* ¶ 11. Marc's emotional rollercoaster during this time was incredibly difficult for her. *Id.* ¶ 13.

Juliette was caught between caring for her two small children and being there for Marc, always feeling as if she was failing one of them. *Id.* ¶¶ 15–16. During this difficult period, the military housing provided for her was "unsafe and unsanitary," making it all the more challenging to care for her kids and much more stressful for her. *Id.* ¶ 17. Juliette started to suffer from panic attacks and feelings of isolation. *Id.* ¶ 19.

Marc's emotional challenges and the resulting changes to his personality, particularly his mood swings and quick temper, were extremely difficult for Juliette. *Id.* ¶ 20. Marc developed a persistent sense of paranoia causing him to be regularly frustrated and angry. *Id.* ¶ 22. Despite the effort she was making to care for him, Marc said things to Juliette that were hurtful and

destructive to their marriage. *Id.* ¶¶ 21–22. As a result, Juliette returned home before Marc had finished his recovery and sought medical treatment for anxiety. *Id.* ¶¶ 23–24.

After he was medically discharged, Marc rejoined the family, but the problems at home only got worse. *Id.* ¶¶ 25–27. The paranoia evolved into a constant need for control, making Juliette feel as if she could never do anything right. *Id.* ¶ 26. Despite her best efforts, their marriage did not survive the problems caused by Marc's trauma and Juliette and her boys went back to live near her family in England. *Id.* ¶¶ 27–28. That initial separation period was very difficult for Juliette, both financially and emotionally, but she eventually sought needed mental health treatment. *Id.* ¶¶ 28–30. In sum, Juliette feels as if she has been broken in two by the changes to her life that came about because of the Attack. *Id.* ¶ 34.

Based on the emotional strain endured by Juliette and the loss of her marriage relationship with Marc, Plaintiffs suggest a solatium award of $5,200,000, which represents a 30% upward departure from the baseline.

b.    *Shyanne Laliberte*

Shyanne Laliberte is Marc's daughter. Affidavit of Shyanne Laliberte ("Exhibit 13") ¶ 2. She was sixteen years old at the time of the Attack. *Id.* ¶ 4. At that time in her life, Shyanne described Marc as her "steady rock" amidst challenges of a difficult childhood. *Id.* ¶¶ 5–6. She vividly remembers positive memories of time spent with her dad. *Id.* ¶ 7.

Marc tried to keep the news of his injuries from Shyanne and her sister, so it was more than three months after the Attack that she learned from Betsy that he was hurt badly. *Id.* ¶ 8. After learning this news, Shyanne visited her school counselor regularly for therapy. *Id.* ¶ 9. About a year later, Shyanne was forced to move out on her own, relying on friends for a place to live. *Id.* ¶ 11. Throughout that ordeal, she could not rely on support from Marc, who was isolated

37

as he recovered from his injuries. *Id.* ¶¶ 10–11. Even when they were able to connect, changes in Marc's personality prevented her from leaning on him for emotional support. Id.

Despite everything that has happened, Shyanne still looks at Marc as a hero. *Id.* ¶ 12. Four years after the Attack, when Shyanne was twenty years old, she moved in with Marc. *Id.* ¶ 13. Although Marc is not the same man or father that he was before the injuries he suffered from Attack, Shyanne does her best to help him and still looks at him as her hero. *Id.* ¶¶ 12–13. Plaintiffs request a baseline solatium award of $2,500,000 for Shyanne.

   c. *Julia Laliberte*

Julia Laliberte is Marc's daughter. Affidavit of Julia Laliberte ("Exhibit 14") ¶ 2. She is Shyanne's twin sister and was also sixteen at the time of the Attack. *Id.* ¶ 3. She remembers Marc as "full of energy" and as a father who always prioritized spending time with them even though they did not live together. *Id.* ¶ 6. Before the Attack, Shyanne and Julia would visit with Marc about once a month and spoke with him daily whenever he was not deployed overseas. *Id.* ¶ 4.

Like Shyanne, Julia did not learn about Marc's injuries until about three months after the Attack because Marc did not want them to be upset. *Id.* ¶ 7. She was "extremely angry" with her family for not telling them what happened to Marc. *Id.* ¶ 8. Upon hearing the news, Julia did not sleep for days and suffered from constant worry about Marc's wellbeing. *Id.* ¶ 9. Because she was unable to travel, it was more than ten months before Julia saw Marc again, causing her great "fear and anxiety." *Id.* ¶ 10. During that difficult period, no one was telling either her or Shyanne anything about Marc's recovery or his prognosis. *Id.* ¶ 11.

Now, nearly fifteen years after the Attack, Julia notes that Marc still "prefers to be alone and isolates himself." *Id.* ¶ 12. It is difficult for her to engage with her dad because he is so

distant emotionally, *id.*, a stark difference from the father she remembers before the Attack. Julia mourns the loss of that father-daughter relationship. *Id.* ¶ 13. Accordingly, Plaintiffs request a baseline solatium award of $2,500,000 for Julia.

### d.    James Laliberte

James Laliberte is Marc's son. Affidavit of James Laliberte ("Exhibit 15") ¶ 2. He was three years old when the Attack occurred and was living with his mom, Juliette. Ex. 12 ¶ 10. He had a healthy relationship with Marc as a young child, relying on him "for physical, practical, emotional and financial support." Ex. 15 ¶ 4. After the bombing, James did not see Marc for months. Ex. 12 ¶ 18. The first time James was allowed to visit, he yelled out "I don't want to look at Daddy" in response to Marc's burns. *Id.* He remembers being scared to look at Marc, being afraid that his dad would die, and not wanting to hurt his feelings. Ex. 15 ¶¶ 7–8.

Because of a combination of Marc's medical treatment and the subsequent relational tension, James moved four times in the four years after the Attack. *Id.* ¶ 6. He was subsequently diagnosed with autism, explaining, at least in part, why that period of constant change was so difficult for him as he craved normalcy and routine. *Id.* James recognizes that he does not have the father-son bond with Marc that he wants, and believes that this turmoil as a young child is likely one reason why. *Id.* ¶ 9.

As he grew up, with his parents separated, Marc's emotional trauma has caused further difficulty and stress for James. *Id.* ¶¶ 10–14. They do not talk often, and when they do, Marc's memory issues make it challenging. *Id.* ¶ 10. The logistics of traveling are stressful for James and Marc sometimes forgets to make the appropriate plans. *Id.* ¶¶ 11–12. And then when things don't go perfectly, or if James does not meet Marc's expectations, Marc will quickly grow agitated, creating further emotional distance between them. *Id.* ¶ 15. James is saddened by

everything his dad has been forced to deal with because of the Attack, but he also grieves the impact those injuries have had on him and their loss of closeness. *Id.* ¶ 16.

Based on the above, Plaintiffs suggest a solatium award of $3,000,000 for James, which represents a 20% upward departure.

e.    H.L.

H.L. is Marc's youngest son. Ex. 12 ¶ 4. He was born during Marc's deployment to Afghanistan, just a few months prior to the Attack. *Id.* ¶ 10. Because of Marc's injuries, he was not able to see or hold H.L. for the first three months after he returned. Ex. 3 ¶ 25. Marc and Juliette divorced when H.L. was only three years old. Ex. 12 at 7. As a result of the distance between them, H.L. does not feel as if he has a "normal bond" with his father. *Id.*

Marc's injuries result in him becoming quickly frustrated at his son. *Id.* Despite H.L.'s best efforts at connection, he always feels as if he is coming up short. *Id.* Public outbursts leave H.L. feeling uncomfortable around his dad. *Id.* at 7–8. In all, H.L. spends about four or five weeks with Marc each year, but those visits are often marked with difficulty and frustration for all involved. *Id.* ¶ 32. In Juliette's words, "Marc's injuries changed everything for us." *Id.* ¶ 34.

Based on H.L.'s young age at the time of the Attack, and the impact of Marc's injuries on the formation of their father-son relationship, Plaintiffs request a baseline award of $2,500,000.

f.    *Betsy Laliberte*

Betsy Laliberte is Marc's mother. Ex. 16 ¶ 2. After her husband died, Marc served faithfully as Betsy's caretaker before the Attack. *Id.* ¶ 4. They would visit with one another often and she describes Marc as having been "open, loving, and affectionate." *Id.* ¶ 5. Whenever he was home from deployment, Marc would help Betsy around the house and prioritized being

present and available for his family. *Id.* ¶¶ 6–7. If Betsy had a financial need, Marc was there to help with that too. *Id.* ¶ 7.

Upon learning that Marc was injured in a bombing, Betsy describes being "physically and emotionally distressed." *Id.* ¶ 8. Her anxiety was exacerbated by her inability to visit Marc in the hospital, despite her deep concern for his wellbeing and desire to be there for him. *Id.*

The close relationship that Betsy had always enjoyed with Marc quickly changed after the Attack. *Id.* ¶ 9. Instead of the "open, loving, and affectionate" personality, he became "cold and quiet" around her, "seemingly overnight." *Id.* When Betsy tried to talk with Marc about these changes, he either simply remained isolated or responded with anger; in either event discouraging her from trying further. *Id.* ¶ 10. The end result of these interactions has led to an "even greater distance" between Betsy and her son. *Id.*

This worsening relational distance between Betsy and Marc since the Attack has caused her a "devastating sadness." *Id.* ¶ 11. Plaintiffs request a baseline award for Betsy of $2,500,000.

g.    *John Laliberte*

John Laliberte is Marc's brother. Ex. 17 ¶ 2. Before the Attack, John and Marc were very close, as evidenced by their shared mission of building a cabin together in Northern Canada. *Id.* ¶ 4. John heard that Marc had been injured in a bombing as he was preparing for a trip up to that property. *Id.* Because John was Marc's medical power of attorney, and fearing that Marc might be incapacitated, John quickly cancelled the trip north and travelled to Texas to be with Marc during his initial recovery period. *Id.* ¶¶ 5–6.

John took significant time off from work to be at Marc's side, first three weeks and then later one month. *Id.* ¶ 7. Watching Marc suffer from his burns and other injuries was incredibly difficult for John, particularly as he began to experience withdrawals from the pain medications

41

he had been given initially. *Id.* ¶¶ 8–9. John was intimately involved and present for this difficult recovery, even to the point of being responsible for certain medical decisions. *Id.* ¶ 8.

One specific provision of Marc's power of attorney document was that he instructed John not to tell their mother, Betsy, if he was severely injured. *Id.* ¶ 10. John followed Marc's wishes in this regard, at significant personal cost. *Id.*; *see also* Ex. 14 ¶ 8. John and Betsy went from talking daily to rarely ever speaking as a result of this strain on their relationship. Ex. 17 ¶ 10. Plaintiffs request a baseline solatium award for John of $1,250,000.

### iii.   The Family of Jason Roberts

#### a.   *Christina Roberts*

Christina Roberts is Jason's wife. Affidavit of Christina Roberts ("Exhibit 18") ¶¶ 2–3. Christina and Jason were high school sweethearts who have spent the last twenty-eight years together. *Id.* ¶ 4. Jason is Christina's "rock, [her] largest supporter, [her] best friend, and [her] whole world." *Id.* ¶ 5. Their life together before the Attack was like many young married couples—filled with dinner parties and game nights, house projects, traveling and volunteering together, and exploring life together. *Id.* ¶ 6. Their young marriage changed drastically after the Attack.

The worst day of Christina's life was the day she found out about the Attack. *Id.* ¶ 9. At first, she could not locate Jason or find out how to communicate with his care team. *Id.* ¶ 10. She struggled to put together the full picture of Jason's injuries for several days. *Id.* There are no words to describe how helpless Christina felt in those early days. *Id.* ¶ 12. Christina's drive to Walter Reed, where she saw Jason for the first time after the Attack, was full of doubts, questions, and fear about the future. *Id.* ¶ 13. Christina worked hard to document all the

information she received from doctors, but she often felt they were "speaking a foreign language." *Id.* ¶ 14. That period was downright terrifying." *Id.* ¶ 16.

Although Jason has far surpassed expectations for his recovery, his daily life has changed drastically. *Id.* ¶ 17. The hardest decision Christina and Jason made was to amputate his leg. *Id.* ¶ 14. Additionally, they battled repeated infections and constantly had to figure out how to balance Jason wants with the realities of his new condition. *Id.* ¶ 18. Christina and Jason sold their home to move into a handicap accessible home. *Id.* ¶ 20. Any time they want to travel, Christina must ensure their location has proper accommodations. *Id.* Christina and Jason lost the ability to celebrate their favorite holiday, Independence Day, because Jason cannot handle the sight or sound of fireworks. *Id.* ¶ 21.

Jason's injuries and daily needs have taken a tool on Christina's emotional, mental, and physical health. *Id.* ¶¶ 23–27. Jason is constantly reminded of how his life has changed, and that frustration almost ended Jason and Christina's marriage. *Id.* ¶ 23. Christina felt hopeless trying to care for him while also struggling to "keep "[her] own head above water." *Id.* Christina struggled with depression and started taking medication. *Id.* ¶ 24. She lost an "enormous amount of weight" and experienced thyroid issues and panic attacks. *Id.* ¶ 25. Christina withdrew from long-time friendships because she "could not face the differences between who [she and Jason] used to be and who [they] are now." *Id.* ¶ 26. She even struggles to connect with her family. *Id.*

Many days, Christina does not recognize the man she married, but and Jason have fought for their marriage and received therapy and counseling together and individually. *Id.* ¶ 27. Christina decided to go back to school to obtain a mental health degree so she can better support Jason and other families in similar situations. *Id.* ¶ 28. Although, Christina lost her "equal partner," she is grateful to still have Jason by her side. *Id.* ¶ 29. However, she knows that the

trajectory of their lives has changed forever. *Id.* Plaintiffs request a solatium award of $5,200,000 for Christina, which represents a 30% upward departure.

b.     *John Roberts*

John Roberts is Jason's younger brother. Affidavit of John Roberts ("Exhibit 19") ¶ 2. John has always looked up to his older brother, relying on him for "advice and mentorship in every area" of life. *Id.* ¶ 4. When John decided to follow Jason into the Marines, Jason was there to help encourage and prepare him. *Id.* ¶ 5. John looks at Jason as "an example, coach, mentor" and knows that he would not be where he is in life without Jason's help. *Id.* ¶ 6.

John was enrolled in the NROTC program at Auburn University when the Attack occurred. *Id.* ¶ 8. When he learned that Jason had been involved in a bombing, he lost control of his emotions. *Id.* ¶ 7. His initial unhealthy coping mechanisms led to excessive drinking and isolation from those around him. *Id.* ¶ 9. This downward spiral negatively impacted John's physical health, his academic performance, and his relationships; nearly ending with his removal from school. *Id.* ¶ 10.

Once John entered the Marines, he continued to cope with his trauma in unhealthy ways; always feeling as if no one could understand what he was going through. *Id.* ¶¶ 11–12. He used his position with the Marines as a means to seek retribution for what had happened to Jason, even to the point of volunteering for deployments at the expense of his family. *Id.* ¶ 13. John has sought mental health treatment to process these feelings, to no avail. *Id.* ¶ 14.

John and Jason remain close and in regular contact; however, John struggles to let go of the idea that he has failed Jason by not doing enough for him. *Id.* ¶ 15. Unresolved anger and frustration related to this ordeal continues to impact John today. Plaintiffs request a baseline solatium award for John of $1,250,000.

44

### C.    <u>**Economic Losses**</u>

Economic damages are available to victims of terrorism in the form of lost wages and diminished earning capacity. In FSIA cases, "[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages." *Reed*, 845 F. Supp. 2d at 214. Forensic economists Chad L. Staller and Stephen M. Dripps from The Center for Forensic Economic Studies were retained to determine the precise economic losses sustained. *See* Expert Reports from Center for Forensic Economic Studies ("Exhibit 20").

Mr. Staller and Mr. Dripps are "Certified Valuation Analysts" with substantial academic credentials and extensive experience providing economic calculations in FSIA matters. *See, e.g.*, *Coombs v. Islamic Republic of Iran*, Case No. 1:19cv3363, ECF No. 29 at 4 (D.D.C. Nov. 6, 2023) (finding "that Staller and Dripps are both qualified as experts in the field of economic loss computations"); *Selig*, 573 F. Supp. 3d at 65, 68, 72 (finding Dripps and Staller's estimates "well supported").

### i.    **Economic Loss for John J. Stanz**

Mr. Staller and Mr. Dripps provide their expert opinions regarding the economic losses of John J. Stanz. Ex. 20 at 1–15. In doing so, they consider the extent of his injuries in the Attack, his honorable discharge in 2012, his subsequent inability to "sustain gainful employment," and the 100% disability rating assigned to him by the Department of Veteran's Affairs. *Id.* at 2. Based on the testimony provided by Mr. Stanz, they presume for their calculations that, if not for his life-altering injuries, "Mr. Stanz would have served 20 years in the USMC and would have vested in the High-36 military pension plan." *Id.* at 3.

Mr. Staller and Mr. Dripps provided two reasonable worklife estimates, one to age 61.5, based on his age and education, and another to age 67, his Social Security retirement age. *Id.* at

45

3. They also calculated Mr. Stanz's life expectancy to age 78.2, and his healthy life expectancy as 71.8, as a basis for calculating the value of the household services he would have contributed if not for his injuries. *Id.* at 4. Furthermore, the economic loss calculations fully explore and consider the impact of lost earnings, fringe benefits, taxes, household services, lost investment opportunities, and a reduction of any future damages to their net present value. *Id.* at 4–9.

Based on this analysis, Mr. Staller and Mr. Dripps calculated the total lost income to John J. Stanz as a range between $3,614,982 and $4,178,475, depending on which worklife estimate is used. *Id.* at 10. They also calculated a range for the value of lost household services from $25,384 (assuming one hour per week) to $465,529 (assuming hours in line with researched survey data). *Id.* Plaintiffs respectfully request that the Court adopt the Social Security retirement age-based worklife estimate and the data-supported household services figure, leading to a total economic loss award for Mr. Stanz of $4,644,004.

### ii.    Economic Loss for Marc Laliberte

Mr. Staller and Mr. Dripps provide their expert opinions regarding the economic losses of Marc Laliberte. *Id.* at 16–31. In doing so, they consider the extent of his injuries in the Attack, his honorable discharge in 2012, his subsequent earnings history, and the 100% disability rating assigned to him by the Department of Veteran's Affairs. *Id.* at 17. Based on the testimony provided by Mr. Laliberte, they presume for their calculations that, if not for his life-altering injuries, "Mr. Laliberte would have served 20 years in the USMC and would have vested in the High-36 military pension plan." *Id.* at 18.

Mr. Staller and Mr. Dripps provided two reasonable worklife estimates, one to age 64.2, based on his age and education, and another to age 67, his Social Security retirement age. *Id.* They also calculated Mr. Laliberte's life expectancy to age 79.9, and his healthy life expectancy

as 74.7, as a basis for calculating the value of the household services he would have contributed if not for his injuries. *Id.* at 19. Furthermore, the economic loss calculations fully explore and consider the impact of lost earnings, fringe benefits, taxes, household services, lost investment opportunities, and a reduction of any future damages to their net present value. *Id.* at 19–24.

Based on this analysis, Mr. Staller and Mr. Dripps calculated the total lost income to Marc Laliberte as a range between $2,279,028 and $2,587,831, depending on which worklife estimate is used. *Id.* at 10. They also calculated a range for the value of lost household services from $14,347 (assuming one hour per week) to $258,748 (assuming hours in line with researched survey data). *Id.* Plaintiffs respectfully request that the Court adopt the Social Security retirement age-based worklife estimate and the data-supported household services figure, leading to a total economic loss award for Mr. Laliberte of $2,846,579.

### iii.    Economic Loss for Jason Roberts

Mr. Staller and Mr. Dripps provide their expert opinions regarding the economic losses of Jason Roberts. *Id.* at 32–47. In doing so, they consider the extent of his injuries in the Attack, his honorable discharge in 2011, his subsequent earnings history, and the 100% disability rating assigned to him by the Department of Veteran's Affairs. *Id.* at 33. Based on the testimony provided by Mr. Roberts, they presume for their calculations that, if not for his life-altering injuries, "Mr. Roberts would have served 20 years in the USMC and would have vested in the High-36 military pension plan." *Id.* at 34.

Mr. Staller and Mr. Dripps provided two reasonable worklife estimates, one to age 57.9, based on his age and education, and another to age 67, his Social Security retirement age. *Id.* They also calculated Mr. Robert's life expectancy to age 78.1, and his healthy life expectancy as 71.6, as a basis for calculating the value of the household services he would have contributed if

not for his injuries. *Id.* at 35. Furthermore, the economic loss calculations fully explore and consider the impact of lost earnings, fringe benefits, taxes, household services, lost investment opportunities, and a reduction of any future damages to their net present value. *Id.* at 35–40.

Based on this analysis, Mr. Staller and Mr. Dripps calculated the total lost income to Jason Roberts as a range between $3,134,313 and $4,088,839, depending on which worklife estimate is used. *Id.* at 41. They also calculated a range for the value of lost household services from $22,225 (assuming one hour per week) to $385,676 (assuming hours in line with researched survey data). *Id.* Plaintiffs respectfully request that the Court adopt the Social Security retirement age-based worklife estimate and the data-supported household services figure, leading to a total economic loss award for Mr. Roberts of $4,474,515.

### D.    **Punitive Damages**

Under the FSIA, a foreign sovereign who is a state sponsor of terrorism may be held liable for punitive damages. 28 U.S.C. § 1605A(c); *Braun*, 228 F. Supp. 3d at 82. Punitive damages are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Id*. at 87. In weighing such an award, the Court considers:

> (1) the nature of the act itself, and the extent to which any civilized society would find that act repugnant; (2) the circumstances of its planning; (3) Defendants' economic status with regard to the ability of Defendants to pay; and (4) the basis upon which a Court might determine the amount of an award reasonably sufficient to deter like conduct in the future, both by the Defendants and others.

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 33 (D.D.C. 1998). The "application of these factors has not led to a single approach for calculating the amount of punitive damages." *Christie v. Islamic Republic of Iran*, Case No. 1:19cv1289, 2020 WL 3606273, at *21 (D.D.C. July 2, 2020). Instead, a variety of different methods have emerged.

The first method "multiplies a defendant's financial support for international terrorism . . . by a pre-determined multiplier" of usually either three or five. *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 17 (D.D.C. 2011). This is the process known as "the Flatow Method." *Id*. But as the annual expenditures by state sponsors of terrorism continue to rise, courts have recognized that this method leads to exceedingly high awards of punitive damages. *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 75 (D.D.C. 2021). As a result, some have held that the Flatow Method should be reserved for "exceptionally deadly attacks." *See Braun*, 228 F. Supp. 3d at 87.

A second approach "awards a fixed amount of $150,000,000 per affected family." *Id.* (citing *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (D.D.C. 2012); *Gates*, 580 F. Supp. 2d at 75. This method is typically applied when the terrorist attacks are deadly or where "similar conduct has never been litigated." *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 117 (D.D.C. 2020).

A third method multiplies the total compensatory damages awarded to each victim "by a factor between one and five." *Fritz*, 324 F. Supp. 3d at 65. This multiplier is determined based on the severity and reprehensibility of the attack, *Selig*, 573 F. Supp. 3d at 75, and whether the case "involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities." *Frost*, 419 F. Supp. 3d at 117. This approach is often used where victims survive the terrorist attack, with a multiplier of three commonly awarded to survivors of bombings or shootings. *See, e.g.*, *Doe*, 2020 WL 5422844, at *18; *see also Winternitz*, 2022 WL 971328, at *1, 11; *Gill*, 249 F. Supp. 3d at 105–6 (D.D.C. 2017).

Here, the factors support an award of punitive damages. The Attack was a poignant example of reprehensible conduct calculated to inflict maximum damage on the United States and its military personnel. With its vast provision of material support, Iran equipped the Taliban to carry out the Attack. Given the nature of the bombing, injuries of the victims, and comparable findings in similar cases, Plaintiffs suggest that awarding punitive damages at a factor of three times compensatory damages is a suitable measure of punitive damages in this case.

## VIII.   PLAINTIFFS REQUEST POST-JUDGMENT INTEREST

"Post-judgment interest may be awarded against a foreign sovereign where the court has jurisdiction under the FSIA." *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013) (citing *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005) (awarding post-judgment interest on FSIA judgment)). Awards of post judgment interest are mandatory pursuant to 28 U.S.C. § 1961(a). *Lanny J. Davis*, 962 F. Supp. 2d at 165 (citing *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Dammarell*, 404 F. Supp. 2d at 324). Post-judgment interest "shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a) (2006). Given the above, Plaintiffs respectfully request an award of post-judgment interest at the statutory rate.[5]

## IX.   CONCLUSION

WHEREFORE, Plaintiffs pray that the Court grant final judgment against Iran and award the following:

For Counts I and IV, the following:

      a.   Compensatory damages for personal injuries to John, including pain and suffering and economic damages, in the amount of $14,644,004;

---

[5] Plaintiffs respectfully withdraw their prior request for an award of prejudgment interest.

b.  Solatium damages in a total amount of $16,250,000, comprised of the following sums:

- $4,000,000 on behalf of John C. Stanz, father of John;
- $2,000,000 on behalf of Lisa Destro, sister of John;
- $2,000,000 on behalf of Stacy Waite, sister of John;
- $2,000,000 on behalf of Amy Pavlovich, sister of John;
- $2,000,000 on behalf of Tara Archfield, sister of John;
- $2,000,000 on behalf of Cassie Stronz, sister of John; and
- $2,250,000 on behalf of Joseph Stanz, brother of John.

c.  Punitive damages in the amount of three times the compensatory judgments awarded to each individual; and

d.  Post-judgment interest as calculated at the maximum rate allowable by law.

For Counts II and IV, the following:

a.  Compensatory damages for personal injuries to Marc, including pain and suffering and economic damages, in the amount of $10,846,579;

b.  Solatium damages in a total amount of $19,450,000, comprised of the following sums:

- $5,200,000 on behalf of Juliette Laliberte, former spouse of Marc;
- $2,500,000 on behalf of Shyanne Laliberte, daughter of Marc;
- $2,500,000 on behalf of Julia Laliberte, daughter of Marc;
- $3,000,000 on behalf of James Laliberte, son of Marc;
- $2,500,000 on behalf of H.L., son of Marc;
- $2,500,000 on behalf of Betsy Laliberte, mother of Marc; and
- $1,250,000 on behalf of John Laliberte, brother of Marc.

c.  Punitive damages in the amount of three times the compensatory judgments awarded to each individual; and

d.  Post-judgment interest as calculated at the maximum rate allowable by law.

For Counts III and IV, the following:

a.  Compensatory damages for personal injuries to Jason, including pain and suffering and economic damages, in the amount of $14,474,515;

b.  Solatium damages in a total amount of $6,450,000, comprised of the following sums:

- $5,200,000 on behalf of Christina Roberts, spouse of Jason; and
- $1,250,000 on behalf of John Roberts, brother of Jason;

c.  Punitive damages in the amount of three times the compensatory judgments awarded to each individual; and

d.  Post-judgment interest as calculated at the maximum rate allowable by law.

Dated: April 14, 2026                              Respectfully submitted,

                                             _____/s/ Kevin A. Hoffman_____
                                             Randy D. Singer (DCD Bar No. VA057)
                                             Kevin A. Hoffman (DC Bar No. 1044559)
                                             Maryam M. Atty (DCD Bar No. VA137)
                                             SINGER HOFFMAN, LLC
                                             1209A Laskin Road
                                             Virginia Beach, VA 23451
                                             Phone: (757) 301-9995
                                             Fax: (757) 233-1084
                                             Email: randy.singer@singerhoffman.com
                                             Email: kevin.hoffman@singerhoffman.com
                                             Email: maryam.atty@singerhoffman.com
                                             *Counsel for Plaintiffs*