**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN J. STANZ *et al.*,

*Plaintiffs*,

v.

ISLAMIC REPUBLIC OF IRAN,

*Defendant*.

Case No. 25-cv-272 (LLA) (GMH)

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

This action, brought by nineteen plaintiffs, arises out of a bombing targeting U.S. soldiers in Afghanistan ("the Attack"). Three of the plaintiffs were soldiers injured in the Attack (hereinafter the "Servicemember Plaintiffs"). The remaining sixteen plaintiffs are family members of the injured servicemembers (hereinafter "Family Member Plaintiffs"). Plaintiffs bring this action against the Islamic Republic of Iran ("Iran") under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. Plaintiffs seek compensation for physical and emotional injuries sustained because of the Attack. Plaintiffs allege that the Attack was orchestrated by the Taliban with material support from Iran. When Iran failed to appear to defend this action, Plaintiffs filed a motion for default judgment. After a thorough review of the record,[1] the undersigned recommends that the Court grant Plaintiffs' motion and award damages as detailed below.

[1] The relevant docket entries considered by the undersigned are (1) Plaintiffs' Complaint (ECF No. 1); (2) affidavit requesting foreign mailing (ECF No. 6); (3) certificate of Clerk mailing copy of summons and Complaint to Iran (ECF No. 8); (4) notice of failed service under 28 U.S.C. 1608(a)(3) (ECF No. 9); (5) affidavit requesting foreign mailing (ECF No. 10); (6) certificate of Clerk dispatching copy of summons and Complaint to Iran (ECF No. 12); (7) summons returned unexecuted (ECF No. 13); (8) status report (ECF No. 14); (9) second status report (ECF No. 15); (10) return of service and indicated execution of service under diplomatic notes (ECF No. 16); (11) third status report (ECF No. 17); (12) affidavit for default (ECF No. 18); (13) Clerk's Entry of Default (ECF No. 19); and (14) motion for default

# I. BACKGROUND

## A. Factual Background

On August 15, 2009,[2] U.S. soldiers stationed in Afghanistan were patrolling an area near Siawashan Village, Herat Province, to counteract Taliban efforts to interfere with Afghan elections. ECF No. 20-2 at 1–2. The soldiers "met resistance and exchanged weapons fire with multiple Taliban fighters." *Id.* at 6. Upon completion of the mission, the team began their return to base on a narrow roadway that was the only available exit from the village. *Id.* at 6–7. Servicemembers John J. Stanz, Marc Laliberte, and Jason Roberts[3] were riding in the sixth of eight armored vehicles in the patrolling convoy. *Id.* at 2, 7. At approximately 3:45 am on August 16, 2009 their vehicle was struck by an improvised explosive device ("IED") buried on the roadway. *Id.* at 2, 7. The vehicle was launched into the air and burst into flames. *Id.* at 7. The driver and one passenger were killed on impact. *Id.* at 2. Injured Plaintiffs were ejected from the vehicle and suffered various injuries. *Id.* Eventually, they were "transported to the Spanish hospital at Herat airfield for emergency medical treatment." *Id.* at 7.

Injured Plaintiffs continue to endure lasting effects from their injuries. John was in the bed of the vehicle when the explosion occurred. ECF No. 20-4, ¶ 5. The force of the explosion launched him 75 feet from the burning vehicle, knocking him unconscious. *Id.*, ¶¶ 6, 10. He remained in a coma for 52 days. *Id.*, ¶ 10. When he did wake up, he had "no independent memories from two weeks before the Attack until about ten weeks after." *Id.*, ¶ 9. As a result of his

judgment (ECF No. 20). Citations to page numbers reflect the pagination assigned by the Electronic Case Filing system.

[2] Plaintiffs note that documents identify the date of the Attack as both August 15 and August 16, attributing the difference to "no more than a time-zone related complication." ECF No. 20-2 at 1, n. 1.

[3] Because this case involves family members with the same last name, the Court introduces Plaintiffs by first and last name and subsequently refers to them by their first names.

injuries, he was found unfit for further military service, effectively ending his "life's dream of serving and operating in the special operations units of our military," causing continued frustration. *Id.*, ¶¶ 11–13. Additionally, he had to relearn how to walk, eat, and use the bathroom. ECF No. 20-9, ¶ 18. He suffers from loss of mobility, incontinence, post-traumatic stress disorder (PTSD) outbursts, and the residual impact of a traumatic brain injury. ECF No. 20-4, ¶¶ 16–18. These injuries have made it difficult to maintain jobs. *Id.*, ¶ 14. As a result of the PTSD, he continues to "experience memory issues, anger outbursts, and make inappropriate comments in public." *Id.*, ¶ 17. These outbursts have created "turmoil" within his family and damaged once healthy relationships. *Id.*, ¶ 18.

The explosion launched Marc 100 feet from the vehicle, knocking him unconscious for a short time. ECF No. 20-5, ¶¶ 12–13. Marc remained in the hospital for four months, receiving surgeries and skin grafts to treat various fractures to his "face, head, left wrist, right shoulder, and left hip," as well as burns across 40 percent of his body. *Id.*, ¶¶ 15–17. After leaving the hospital, Marc continued scar treatments and occupational therapy as part of his recovery process. *Id.*, ¶ 19. The burns and scars "drastically changed" Marc's physical appearance, and he "will never look the way [he] did before the Attack." *Id.* In addition to the physical injuries, Marc suffered severe emotional trauma requiring "several psychiatric sessions to cope with the psychological and emotional impacts." *Id.*, ¶¶ 20–21. The medications he took made him "callous and numb," which took a toll on his familial relationships. *Id.*, ¶ 22. He struggled to emotionally and physically engage with his wife, eventually leading to divorce. *Id.*, ¶ 23. His inability to be physically active also affected the ways in which he could spend time with his children, ultimately leading to a loss of closeness with them. *Id.*, ¶ 24.

At the time of the Attack, Jason was manning the machine gun in the turret of the vehicle. ECF No. 20-6, ¶ 6. The explosion launched him in the air, knocking him temporarily unconscious. *Id.*, ¶¶ 7–8. He awoke to discover his "left leg was severely injured and disfigured," and crawled to his teammates to seek medical help. *Id.*, ¶ 8. He lost consciousness again and has no memories until a week later in the hospital. *Id.*, ¶ 9. As a result of the explosion, Jason's left leg was amputated, and shrapnel had to be removed from throughout his body. *Id.*, ¶ 10. In addition to the leg injury, Jason sustained fractures to his "pelvis, scapula, nose, lumbar vertebrae, and five of [his] ribs." *Id.* He remained in the hospital for over eight months. *Id.*, ¶ 11. Jason states that "no area of [his] life" was "left untouched by the bombing." *Id.*, ¶ 12. His military career was cut short, he remains in constant pain, and he struggles to "connect with others socially or emotionally." *Id.*, ¶¶ 12, 16–17.

Plaintiffs allege that the Attack "was planned, authorized, and executed by the Taliban, with the material support and resources of Iran." ECF No. 20-2 at 2. To aid their allegations of material support, Plaintiffs provide an expert report from Donald Wade Barker, and request that the Court take judicial notice of an additional expert report provided in a previous case. *Id.* at 3-4, 11. Under Federal Rule of Evidence 702, an expert must be qualified by "knowledge, skill, experience, training, or education" and their testimony must be "based on sufficient facts or data" and "reliable principles and methods." Fed. R. Evid. 702.

Donald Wade Barker is an expert on the "supply, distribution, and use of explosive devices" by insurgents in Iraq and Afghanistan. ECF No. 20-2 at 11; ECF No. 20-3, ¶ 8. Mr. Barker served as a member of the U.S. Army between 1995 and 2009, including multiple combat tours in Afghanistan. ECF No. 20-3, ¶ 1. He received several military service awards. *Id.*, ¶ 4. Following his time in the Army, he worked as a researcher at the Georgia Institute of Technology studying

and assessing IED technology. *Id.*, ¶ 3. Currently, he serves as the CEO and Chief Engineer of Evans Research and Development and continues to study "ongoing technological and strategic developments in [his] field on a regular basis." *Id.*, ¶ 6. He has been qualified as an expert witness in multiple other cases[4] involving the use of IEDs and counter IED technology. *Id.*, ¶¶ 8–10. The undersigned finds Mr. Barker sufficiently qualified to testify as an expert on the use of explosive devices in Afghanistan during the relevant timeframe.

Mr. Barker provided an expert affidavit dated March 24, 2026, assessing evidence and documents related to the Attack. ECF No. 20-3. He reports that the timing of the Attack and placement of the IED buried on a narrow road that was "the only road available for the convoy to return" to base suggests the "intentional targeting of American service members" and "foreign involvement or training." *Id.*, ¶ 15. Mr. Barker opines that the sophisticated triggering mechanism and the explosive material used is "suggestive of support from the IRGC [Iranian Revolutionary Guard Corps]." *Id.*, ¶¶ 16–18. Further, he avers that the geographic location of the Attack near the Iran-Afghan border and the occurrence of the Attack during a time when the Taliban was seeking to disrupt Afghan elections is "consistent with Iranian goals to undermine broader security efforts within Afghanistan." *Id.*, ¶¶ 21–22. Mr. Barker concludes based on the evidence he reviewed that the IED that caused the Attack "was designed and build with direct Iranian involvement and/or training." *Id.*, ¶ 23.

Plaintiffs also request that the Court take judicial notice of the Expert Report of Steven A. Wood, presented as evidence in another case before this District involving the same bombing. ECF No. 20-2 at 4. *See generally Cabrera v. Islamic Republic of Iran* ("*Cabrera I*"), Nos. 19-cv-3835,

[4] *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 17 (D.D.C. 2019); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 159 (D.D.C. 2022); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 2 475, 482 (D.D.C. 2021); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 291 (D.D.C. 2022); *Soto v. Islamic Republic of Iran*, No. 15-cv-08410, 2024 WL 1376439, at *2 (N.D. Ill. Mar. 31, 2024).

18-cv-2065, 2022 WL 2817730 (D.D.C. July 19, 2022). *Cabrera* is a bellwether case in which the court heard evidence regarding material support provided by Iran to a terrorist syndicate in Afghanistan between 2006 and 2019. The court in *Cabrera* held a three-day evidentiary hearing regarding eleven bellwether attacks, one of which was the IED Attack at issue in this case. *Cabrera I*, 2022 WL 2817730, at *1. There, the court found "Iran's material support for the Taliban substantially contributed to the Taliban's ability to conduct" the August 15, 2009 attack. *Id.* at *18–19.

Because "the FSIA does not require this Court to relitigate issues that have already been settled," courts can and do take judicial notice "'of related proceedings and records in cases before the same court'" and of the "findings of other judges in this jurisdiction" when determining FSIA jurisdictional issues. *See Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) (quoting *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006) ("*Heiser I*")). Of course, courts cannot merely adopt the findings reached in a prior, related case. "Instead, courts in this district rely on the evidence presented" in the other cases "and make their own independent findings of fact based on that evidence." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014). Taking judicial notice in this manner is consistent with the "unusual degree of discretion" district courts have "over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan,* 590 U.S. 418 (2020); *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (noting that "the Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations'") (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).

Therefore, the Court should not blindly adopt *Cabrera's* findings of fact, but may take judicial notice of the Expert Report of Steven A. Wood. The *Cabrera* court qualified Lt. Col. Wood as an expert in "attack attribution analysis." *Cabrera I*, 2022 WL 2817730, at *5. Lt. Col. Wood has "extensive experience in intelligence and weapons analysis related to U.S. counterterrorism operations, particularly in the Afghanistan theater of operations." Expert Report of Steven A. Wood at ¶ 1; *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (D.D.C. Oct. 4, 2021), ECF No. 59-3 (hereinafter "Wood Report"). Lt. Col. Wood relied on his prior experiences working in anti-terrorism for the U.S. military, and a review of relevant military intelligence documents to draw the conclusions reached in his report. *Id.*, ¶ 5. Based on the information reviewed, Lt. Col. Wood concludes that "the Taliban committed the August 16, 2009 complex attack." *Id.*, ¶ 153. He bases that conclusion on the geographic location of the attack, the IED attack method, and U.S. government investigation documents. *Id.* First, the attack occurred near the Iran-Afghanistan border, and "proximity to the Iranian border made the area a focus in the struggle between Western security forces and the Taliban." *Id.*, ¶ 155. Next, Lt. Col. Wood opines that the "high level of training and coordination" required to execute the attack indicates reliance on outside training and weapons from Iran. *Id.*, ¶ 161–162. Lastly, Lt. Col. Wood cites the U.S. investigations report for further evidence that the Taliban conducted the attack. *Id.*, ¶ 164–165.

**B. Procedural Background**

Plaintiffs filed this action on January 30, 2025, seeking to hold Iran responsible under the terrorism exception of the FSIA for injuries resulting from an act of extrajudicial killing. ECF No. 1. On March 6, 2025, Plaintiffs requested the Clerk of the Court's assistance to effect service on Defendant pursuant to 28 U.S.C. § 1608(a)(3). ECF No. 6. On March 12, 2025, the Clerk dispatched by mail a copy of the summons, complaint, notice of suit, and copy of each translated into Farsi. ECF No. 8. When Defendant failed to respond within thirty days, Plaintiffs requested the

Clerk's assistance in effecting service pursuant to 28 U.S.C. § 1608(a)(4) on April 14, 2025 via diplomatic note through the Foreign Interests Section of the Embassy of Switzerland in Tehran. ECF Nos. 10 & 16. Service was executed on Iran's Ministry of Foreign Affairs via that method on December 21, 2025. ECF No. 16. Defendant had sixty days to file a response. *Id.* When Defendant failed to respond or file an answer by the deadline, Plaintiffs filed an affidavit for entry of default on March 2, 2026. *See* ECF No. 18. The Clerk of the Court entered default the next day. ECF. No. 19. On April 14, 2026, Plaintiffs filed the present motion for default judgment. ECF No. 20. On May 14, 2026, this case was randomly referred to the undersigned for a Report and Recommendation on the motion. Minute Order (May 14, 2026).

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment. Fed. R. Civ. P. 55(a)–(b); *see also United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020). First, a plaintiff must request "that the Clerk of Court enter default against a party who has failed to plead or otherwise defend." *Cryptocurrency*, 473 F. Supp. 3d at 4 (citing Fed. R. Civ. P. 55(a)). Second, the plaintiff must then apply for a default judgment against the absent defendant. *Id.* (citing Fed. R. Civ. P. 55(b)).

A default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party." *Doe v. Syrian Arab Republic*, No. 18-cv-66, 2020 WL 5422844, at *5 (D.D.C. Sep. 10, 2020) (internal citations omitted). "[D]efault judgment is warranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected by its failure to respond, 'either to the summons and complaint, the entry of default, or the motion for default judgment.'" *Id.* (internal citations omitted). However, a notation of default by the Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to a default judgment. Rather, it is appropriate only if the complaint's well-pleaded allegations,

accepted as true, state an adequate claim for relief. *See Marmaras v. Marafatsos*, No. 18-1236, 2019 WL 3414363, at *2 (D.D.C. July 29, 2019); *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008). In other words, entry of default "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint,' but not for allegations that are not sufficiently pleaded." *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd.*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)). In that way, "'[c]onceptually, . . . a motion for default judgment is like a reverse motion to dismiss for failure to state a claim.'" *Doe*, 2020 WL 5422844, at *5 (alteration in original) (quoting *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015)).

A default judgment may be entered against a foreign sovereign defendant when (1) personal jurisdiction is properly exercised over the defendant; (2) subject matter jurisdiction over the claims is established; (3) the plaintiff has satisfactorily presented evidence establishing the defendant's liability to the plaintiff; and (4) plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017). The FSIA requires a plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). That evidence must also be admissible. *Owens*, 864 F.3d at 786–87. A court must "scrutinize the plaintiff's allegations and 'may not unquestioningly accept a complaint's unsupported allegations as true.'" *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 152 (D.D.C. 2019) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012)). However, "[c]ourts take uncontroverted factual allegations that are supported by admissible evidence as true." *Blank v. Islamic Republic of Iran*, No. 19-cv-3645, 2021 WL 3021450, at *6 (D.D.C. July 17, 2021) (internal citations omitted). An evidentiary

hearing is not required; rather, a "plaintiff may establish proof by affidavit." *Compagnie Sahélienne d'Entreprise v. Republic of Guinea*, No. 20-cv-1536, 2021 WL 2417105, at *2 (D.D.C. June 14, 2021); *see also Przewozman v. Islamic Republic of Iran*, 628 F. Supp. 3d 307, 312 (D.D.C. 2022) ("'In the absence of an evidentiary hearing,' plaintiffs may satisfy their burden of demonstrating personal jurisdiction by making a 'prima facie showing' based on 'their pleadings,' and 'bolstered by such affidavits and other written materials as they can otherwise obtain.'" (quoting *Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005))).

Additionally, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action." *Egypt Dep't of Def. v. Alboghdady*, No. 21-cv-1144, 2021 WL 3737682, at *3 (D.D.C. Aug. 24, 2021) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)). The party seeking the default judgment is required to demonstrate that "the court has both subject-matter jurisdiction over the action and personal jurisdiction over the absent defendant." *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *2 (D.D.C. Apr. 24, 2019), *aff'd sub nom*. *Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021). And "'[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied.'" *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

If a court deems default judgment appropriate, it must independently determine the appropriate remedies. *See Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 70 (D.D.C. 2018) ("'[U]nless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded.'" (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C.

2001))). Specifically, "unlike a plaintiff's well-pleaded allegations as to liability, a court does not take factual allegations related to damages as true." *Doe*, 2020 WL 5422844, at *6. Rather, "a court makes its damages determination 'in light of the facts and the circumstances of the case at hand.'" *Id.* (quoting *SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2010)). "While the court may conduct a hearing to fix the amount of damages, it is not required to do so, 'as long as it ensure[s] that there [is] a basis for the damages specified in the default judgement.'" *Id.* (quoting *SEC v. China Holdings, Inc.*, No. 09-cv-2045, 2010 WL 11603046, at *2 (D.D.C. Sep. 24, 2010) (alterations in original)).

## III. DISCUSSION

### A. Subject Matter Jurisdiction

For FSIA cases, subject matter jurisdiction is a precondition for personal jurisdiction. *See* 28 U.S.C. § 1330(b). Therefore, the undersigned begins with the issue of subject matter jurisdiction over Plaintiff's claims. Section 1330(a) of Title 28 of the United States Code grants district courts original subject-matter jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions (2) as to any claim for relief *in personam* (3) against a foreign state (4) provided that the foreign state is not entitled to immunity under sections 1605 to 1607 of the FSIA or under international agreement. *See* 28 U.S.C. § 1330(a); *Braun*, 228 F. Supp. 3d at 75; *Reed*, 845 F. Supp. 2d at 210.

The first three factors are easily met here: (1) Plaintiffs filed a nonjury civil action, (2) seeking *in personam* relief, (3) against a foreign sovereign, Iran. *See generally* ECF No. 1. Thus, the Court has subject matter jurisdiction over the present "nonjury civil action" against Iran "if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied." *Fritz v. Islamic Republic of Iran* ("*Fritz I*"), 320 F. Supp. 3d 48, 77 (D.D.C. 2018). Plaintiffs contend that this lawsuit falls within the FSIA's "terrorism exception"—§ 1605A—because

Defendant provided material support and resources to the Taliban causing Plaintiffs' personal injuries as a result of an extrajudicial killing. *See* 28 U.S.C. § 1605A(a)(1); ECF No. 20-2 at 7–13. The terrorism exception provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . .

28 U.S.C. § 1605A(a)(1). For an FSIA claim to be heard in federal court, the victims seeking relief under this exception must prove that (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," § 1605A(a)(2)(A)(i)(I); and (2) "the claimant or the victim was, at the time the act . . . occurred a national of the United States," 28 U.S.C. § 1605A(a)(2)(A)(ii)(I).[5] For a foreign sovereign's immunity to be nullified, the plaintiffs must also (3) seek monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, [or] hostage taking"; and (4) the act, or the provision of material support or resources for the act, must be engaged in by an official, employee, or agent of the defendant. *Mohammad v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 28 U.S.C. § 1605A(a)(1)). Each requirement will be addressed in turn.

*1. State Sponsor of Terrorism*

The United States designated Iran a state sponsor of terror in January 1984, and it has remained so designated since that time. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary

[5] Section 1605A(a)(2)(A)(iii) also requires that, in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant must afford the foreign state a "reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." Because Plaintiffs here bring suit against Iran for an attack that occurred in Afghanistan, the Plaintiffs do not need to satisfy the arbitration requirements. ECF No. 20-2 at 8 n. 3; *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 35 (D.D.C. 2016) (holding that the plaintiffs did not need to satisfy the third arbitration requirement because they brought suit against Syria for a terrorist attack that occurred in Jordan).

of State George P. Shultz); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 59 (D.D.C. 2021) (noting that "the U.S. State Department designated Iran as a State Sponsor of Terrorism in 1984"); U.S. Dep't of State, Bureau of Counterterrorism, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/VF4X-JQU4] (last visited on September 29, 2026).

*2. Plaintiff's Citizenship*

Each of the three Injured Plaintiffs are United States citizens and were serving active duty as members of the United States armed forces at the time of the Attack. ECF No. 20-4, ¶¶ 1, 3; ECF No. 20-5, ¶¶ 1, 4; ECF No. 20-6, ¶¶ 1, 3. With one exception, the remaining Family Member Plaintiffs were also United States citizens at the time of the Attack. ECF No. 20-7, ¶ 1; ECF No. 20-8, ¶ 1; ECF No. 20-9, ¶ 1; ECF No. 20-10, ¶ 1; ECF No. 20-11, ¶ 1; ECF No. 20-12, ¶ 1; ECF No. 20-13, ¶ 1; ECF No. 20-14, ¶ 1; ECF No. 20-15, ¶ 1; ECF No. 20-16, ¶ 1; ECF No. 20-17, ¶ 1; ECF No. 20-19, ¶ 1; ECF No. 20-20, ¶ 1; ECF No. 20-21, ¶ 1. Betsy Laliberte, mother of Marc Laliberte is a Canadian citizen and was not a United States citizen at the time of the Attack. ECF No. 20-18, ¶ 1. However, "'this fact is non-consequential' for jurisdictional purposes, . . . because 'the waiver of foreign sovereign immunity applies so long as 'the claimant <u>or</u> the victim was, at the time of the' terrorist attack, a U.S. national, member of the armed forces, or government employee.'" *Estate of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 145 (D.D.C. 2024) (emphasis in original) (quoting *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 369 (D.D.C. 2020)); *see also* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I) ("the claimant *or* the victim was, at the time the act . . . occurred a national of the United States") (emphasis added). Therefore, because the direct victims of the Attack—the Servicemember Plaintiffs—were United States citizens when the Attack occurred, all Plaintiffs have satisfied this requirement.

*3. Extrajudicial Killing*

Plaintiffs' theory is that their injuries were caused by an act of extrajudicial killing. ECF No. 20-2 at 8-9. An "[e]xtrajudicial killing" is defined for purposes of the FSIA (by means of the Torture Victim Protection Act of 1991) as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any killing that, under international law, is lawfully carried out under the authority of a foreign nation." Torture Victim Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note); 28 U.S.C. § 1350(3)(a); *see also* 28 U.S.C. § 1605A(h)(7). The D.C. Circuit has interpreted this text to include three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. Additionally, for a terrorist attack to constitute an extrajudicial killing, the attack must result in the death of at least one person other than the perpetrator. *See Borochov v. Islamic Republic of Iran*, 94 F. 4th 1053, 1060–61 (D.C. Cir. 2024); *see also Cabrera v. Islamic Republic of Iran*, 752 F. Supp. 3d 183,189 (D.D.C. 2024) (noting that the Circuit Court in *Borochov* "made clear that § 1605A only confers jurisdiction over a claim if the relevant attack resulted in a completed extrajudicial killing" (emphasis in original)). Here, two individuals were killed in the Attack. ECF No. 20-2 at 2. Although Servicemember Plaintiffs were not killed, because at least one individual was killed in the attack, the attack constitutes an extrajudicial killing. *See Baker v. Islamic Republic of Iran*, No. 22-cv-2765, 2025 WL 2480075, at *17 (D.D.C. Aug. 28, 2025) (finding injuries are caused by an extrajudicial killing when, despite plaintiffs' survival, the attack results in "at least one fatality either of a U.S. servicemember or a foreign national"); *see also Salzman v. Islamic Republic of Iran*, No. 17-cv-2475, 2019 WL 4673761, at *12 (D.D.C. Sep. 25, 2019) (finding that, although plaintiffs survived, their injuries resulted from an extrajudicial killing

because five others died in the same attack). There is no evidence that the IED attack at issue was authorized by "a prior judgement affording judicial guarantees or due process." *See Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); *see also Han Kim*, 774 F.3d at 1050–51 (concluding that an extrajudicial killing is one without due process). Therefore, the Attack satisfies the extrajudicial killing requirement.

*4. Material Support*

Material support is the provision of "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18.").

Although evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, successful showings have generally focused on the foreign state's offer of safe haven to the terrorist group, provision of financing, weapons, or assistance with its recruitment, or motive to foment unrest in an area where the group is operating. *See generally W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 136 (D.D.C. 2019) (finding that Iran provided material support to the Badr Organization through support of efforts to overthrow Sunni rule in Iraq and direct funding); *Thuneibat*, 167 F. Supp. 3d at 36 (finding Syria provided material support to Al-Qaeda in Iraq (AQI) by allowing it to operate and plan terrorist attacks from within Syria by providing essential financing to the group); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 68–69 (D.D.C. 2008) (finding Syria provided material support to AQI by offering it a safe haven for its operations, and by supporting its training and recruitment efforts); *Ben-Rafael v.*

*Islamic Republic of Iran*, 540 F. Supp. 2d 39, 45 (D.D.C. 2008) (finding that Iran provided material support to Hezbollah by funding training camps).

Plaintiffs rely on the expert reports of Mr. Barker and Lt. Col. Wood to demonstrate Iran's provision of material support of the Attack. Sufficient evidence indicates that the Taliban committed the Attack with support from Iran. *See* Wood Report ¶¶ 161–63, 167(b)–(c); *see also Cabrera I*, 2022 WL 2817730, at *18. The U.S. Investigations and Incidents Report reviewed by Lt. Col. Wood concluded that the Attack was "conducted by 'Insurgents.'" Wood Report ¶ 164. Lt. Col. Wood opines that the term "insurgents" was commonly used by the U.S. government to reference Taliban-led and anti-Afghan forces to avoid official recognition of the term "Taliban." *Id.*, ¶ 165; *Cabrera I*, 2022 WL 2817730, at *19 (noting that the U.S. government used the term "insurgents" to avoid the "potentially honorary connotations of the term 'Taliban'").

Further, the sophistication of the Attack and premeditated placement of the IED indicate training and aid from outside groups. ECF No. 20-3, ¶¶ 23–24. The triggering mechanism that caused the explosion required sophisticated engineering knowledge "beyond the tactical capabilities of the Taliban in 2009 without the active assistance of a state sponsor." *Id.*, ¶ 20. And, the tactical coordination of the Attack was "unusual for typical Taliban encounters and likely indicates significant foreign training or direct participation by foreign fighters." Wood Report ¶ 162. Given the proximity of the Attack to Iran and cultural ties in the area, there is sufficient evidence that Iran provided material support for the Attack. *See id.*, ¶¶ 163; ECF No. 20-3, ¶ 21. At the time of the Attack, Iran and the IRGC directly supported Taliban efforts to disrupt Afghan elections. Wood Report ¶¶ 162–63; ECF No. 20-3, ¶ 22. Based on all the evidence before it, the Court should determine that Iran provided material support to the Taliban to conduct the Attack.

Finally, Plaintiffs have shown that Iran's material support of the Taliban was a legally sufficient cause of the Attack. *See Owens*, 864 F.3d at 778 (requiring plaintiffs to show that the foreign sovereign's material support is a legally sufficient cause of the terrorist attack at issue). To satisfy this standard, Plaintiffs must show that (1) the defendant's actions were a "substantial factor" in the sequence of events that caused plaintiff's injury and (2) the injury was a "reasonably foreseeable consequence or anticipated as a natural consequence" of defendant's conduct. *Id.* at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). As noted above, the Attack's advanced engineering, planning, and tactical coordination would have been beyond the capabilities of the Taliban acting alone. ECF No. 20-3, ¶¶ 20, 24(a)–(b); Wood Report ¶¶ 162, 167(b). Thus, Iran's support for the Taliban was clearly a substantial factor in enabling this Attack. *See also Cabrera I*, 2022 WL 2817730, at *18 (finding based on testimony from Lt. Col. Wood that "Iran's material support for the Taliban substantially contributed to the Taliban's ability to conduct" this Attack).

Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's actions supporting the Taliban. Injuries such as those suffered by the Servicemember Plaintiffs are clearly foreseeable consequences of Iran's assistance in the design and detonation of the explosive device used in the Attack. *See* ECF No. 20-3, ¶¶ 16–18. As this Court has acknowledged before, "injuries [] and trauma are obviously reasonably foreseeable results of a terrorist attack. Indeed, those are the *goals* of a terrorist attack of this sort." *Estate of Khalil Farhat v. Islamic Republic of Iran*, No. 19-cv-3631, 2024 WL 706971, at *8 (D.D.C. Feb. 21, 2024) (emphasis in original). Thus, the material support that Iran provided the Taliban was a proximate cause of the Attack.

For these reasons, the undersigned finds that this Court has subject-matter jurisdiction over this action.

### B. Personal Jurisdiction

The undersigned next examines if effective service has been made pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign sovereigns. That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). Service is made on a foreign state under section 1608 in one of four ways:

1. by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

2. if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

3. if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

4. if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The methods of service provided in section 1608(a) "are listed in order of preference; plaintiffs must attempt the first method before proceeding to the next." *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012). "[S]trict adherence to the terms of 1608(a) is required" and "neither substantial compliance, nor actual notice, suffice[s]." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v.*

*La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). As many litigants do in FSIA cases against Iran, Plaintiff successfully served Iran pursuant to Section 1608(a)(4).

Iran does not have a special arrangement for service with Plaintiff, nor has it "entered into any international convention governing service" of judicial documents, so sections 1608(a)(1) and 1608(a)(2) do not provide avenues for service. *See Blank*, 2021 WL 3021450, at *8. On March 6, 2025, Plaintiffs attempted service under section 1608(a)(3) and requested that the Clerk of Court mail a copy of the notice of suit, summons, complaint, and a copy of each translated into Farsi to the Ministry of Foreign Affairs of Iran. ECF No. 6-1. On March 12, 2025, the Clerk of Court mailed "[o]ne copy of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to of 28 U.S.C. 1608(a)(3)." ECF No. 8 at 1. On April 15, 2025, Plaintiff filed a notice of failed service stating that no response was received from Defendant within thirty days. ECF No. 9. Thus, service under 1608(a)(3) was unsuccessful and nothing more was required under that section. *See Sisso v. Islamic Republic of Iran,* 448 F. Supp. 2d 76, 83 (D.D.C. 2006) (finding "if mailed service cannot be accomplished within thirty days, then the statute permits the plaintiff to request" service under 1608(a)(4)); *Doe*, 2020 WL 5422844, at *12 (concluding "[n]othing more was required for [the plaintiffs] to satisfy their obligations to attempt service under section 1608(a)(3)" after the Clerk of the Court mailed the documents and the Syrian Foreign Ministry refused delivery); *Ben-Rafael,* 540 F. Supp. 2d at 52 (similar).

Plaintiff then moved to the method of service prescribed by section 1608(a)(4) and requested that the Clerk mail two copies of the summons and complaint to the U.S. Department of State for service through diplomatic channels. ECF Nos. 10 & 10-1. On April 15, 2025, the Clerk

of Court mailed "[t]wo copies of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by FedEx, to the U.S. Department of State . . . pursuant to the provisions of 28 U.S.C. § 1608(a)(4)." ECF No. 12. On February 17, 2026, the State Department filed a return of service affidavit demonstrating that service was executed on Iran on December 21, 2025, through a diplomatic note delivered by the American Interests Section of the Embassy of Switzerland in Tehran. ECF No. 16. Thereafter, Iran failed to timely respond within 60 days. ECF 17 at 1.

Accordingly, service on Iran was completed under section 1608(a)(4), and the Court therefore has personal jurisdiction over Iran. *See, e.g., Blank*, 2021 WL 3021450, at *9 (finding that court had personal jurisdiction over Iran where "the United States Department of State stated in a letter that it had met the requirements for diplomatic service under § 1608(a)(4) by causing delivery of the summons, complaint, and notice of suit to Iran through Swiss channels").

**C. Iran's Liability Under the FSIA**

The undersigned turns to determining whether Plaintiffs have established Iran's liability under a viable cause of action. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010) (plaintiffs must "prove a theory of liability under which defendants cause the requisite injury or death"). Historically, the terrorism exception to the FSIA did not create a federal cause of action but operated as a "pass-through" for state law claims. *Owens*, 864 F. 3d at 763; *see also Fritz I*, 320 F. Supp. 3d at 89. In 2008, Congress amended the FSIA in part "to promote uniformity and extend access to U.S. federal courts to foreign national immediate family members of victims of terrorism." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 155 (D.D.C. 2011). The amendments provided a federal right of action for U.S. nationals, members of the armed forces, and U.S. government employees under Section 1605A(c). Plaintiffs who do not fall into those categories, including foreign plaintiffs, may rely on a pass-through approach. *See Owens*,

864 F. 3d at 809 ("U.S. nationals will continue to sue under § 1605A(c) and benefit from its consistent application. But the pass-through approach remains viable to effectuate the intent of the Congress to secure recoveries for other plaintiffs harmed by a terrorist attack"). All Plaintiffs in this case are U.S. citizens except for Betsy Laliberte, who is a Canadian citizen. The undersigned assesses Iran's liability to the U.S. citizen plaintiffs before turning to Betsy.

*1. U.S. Plaintiffs with a Cause of Action Under 1605A(c)*

While section 1605A(c) offers a general private right of action for U.S. citizens, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force*, 464 F. Supp. 3d at 361–62. Rather, those FSIA plaintiffs are also required "to prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine if U.S. citizen plaintiffs have properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA). Here, the U.S. citizen Plaintiffs assert three theories of liability based on assault, battery, and intentional infliction of emotional distress.

*a. Assault*

Defendant is liable for assault under the Restatement if their agents' acts were "intend[ed] to cause a harmful or offensive contact with . . . or an imminent apprehension of such contact" to Servicemember Plaintiffs and Servicemember Plaintiffs were "thereby put in such imminent apprehension." Restatement (Second) of Torts, § 21(1) (1965). As this court has previously

determined, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore*, 700 F. Supp. 2d at 76. The perpetrators of instantaneous events, like explosions, are not liable for assault, however, where there is no evidence that the victims experienced an "immediate apprehension of harmful or offensive contact" prior to the attack in question. *Encinas v. Islamic Republic of Iran*, No. 18-cv-02568, 2022 WL 22888691, at *14 (D.D.C. Feb. 28, 2022). For instance, in *Encinas*, Judge Nichols denied an assault claim where the plaintiffs failed to demonstrate the victims apprehended the blast in the 1983 Beirut bombing prior to it occurring. *Id.* at 13–14. One plaintiff, for example, "never explain[ed] that he saw or heard the explosion coming," and another did "not testify that the split second between the explosion and the contact put him in apprehension" of the attack. *Id.* at *13.

Like the plaintiffs in *Encinas*, Servicemember Plaintiffs have not provided insufficient evidence establishing that they were placed in apprehension of harmful or offensive conduct prior to the bombing. John Stanz's affidavit states that the explosion occurred "without warning." ECF 20-4, ¶ 6. Marc Laliberte only remembers "seeing a massive flash of light" before "everything went blank" and he was launched from the vehicle. ECF 20-5, ¶¶ 11–12. Jason Roberts stated that the explosion occurred "[o]ut of nowhere" and left him unconscious for a short time before he crawled to safety. ECF 20-6, ¶¶ 7–8. None of those descriptions demonstrate that Servicemember Plaintiffs had any apprehension of the harmful contact before it occurred. Therefore, their claims based on assault should be denied without prejudice as was done in *Encinas*.

*b. Battery*

The Servicemember Plaintiffs' battery claims fare better. Iran is liable for battery if its officials acted "'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by, those attacked and . . . 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 36 (D.D.C.

2012) (first and third alterations in original) (quoting Restatement (Second) of Torts § 13). Again, "[a]cts of terrorism are, by their very nature, intended to harm," satisfying the first element. *Valore*, 700 F. Supp. 2d at 76. Second, because of the Attack, the Servicemember Plaintiffs suffered severe physical injuries. ECF No. 20-4, ¶ 11; ECF No. 20-5, ¶ 15; ECF No. 20-6, ¶ 10. And, they have demonstrated that Iran provided material support with the intent to harm U.S. soldiers. *See generally* Wood Report. In *Cabrera*, similar demonstrations that Iran "provided material support…with the intent to kill and wound Americans in attacks" was sufficient to demonstrate that "harmful contacts" occurred. *Cabrera I*, 2022 WL 2817730, at *42. Therefore, the Court should find that Iran acted with the intent to cause harmful contact. Accordingly, the three Servicemember Plaintiffs have established Defendant's liability under Section 1605A(c) for battery.

*c. Intentional Infliction of Emotional Distress*

All U.S. Citizen Plaintiffs also claim that Defendant is liable under a theory of intentional infliction of emotional distress (IIED). ECF No. 20-2 at 17. Under general principles of tort law in the Restatement (Second) of Torts, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress," both to the primary victim and "to a member of such person's immediate family who is present at the time." *Estate of Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46). As the *Heiser II* court reasoned, terrorism is "unique among the types of tortious activities in both its extreme methods and aims," in that it is "intended to cause the highest degree of emotional distress, literally, terror." *Id.* at 27 (internal quotation marks omitted) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)); *see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."). Immediate family members of terrorism victims may

state a claim for IIED even if they were not present when the attack at issue occurred. *Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018).

The Servicemember Plaintiffs demonstrate the extreme emotional distress they experienced and continue to experience because of the Attack. ECF Nos. 20-4 through 20-6. John stated that he experiences anger outbursts and memory issues leading him to "consume alcohol to help cope with these challenges, which does not ultimately help." ECF No. 20-4, ¶ 17. Marc "participated in several psychiatric sessions to cope with the psychological and emotional impacts" that continue to impact his daily life. ECF No. 20-5, ¶¶ 20-21. John struggles to "connect with others socially or emotionally" because of his injuries. ECF No. 20-6, ¶ 16. Additionally, all Family Member Plaintiffs provided affidavits detailing the impact of the Attack on their lives. ECF Nos. 20-7 through 20-17, 20-19 through 20-21. All of them demonstrate severe emotional distress resulting from the Attack including struggles with anxiety, depression, and fundamental changes within their family dynamics. ECF No. 20-7, ¶¶ 10, 16; ECF No. 20-8, ¶¶ 8–11; ECF No. 20-9, ¶¶ 20–22; ECF No. 20-10, ¶ 13; ECF No. 20-11, ¶¶ 9, 20, 23; ECF No. 20-12, ¶ 11; ECF No. 20-13, ¶¶ 7–12; ECF No. 20-14, ¶¶ 19, 24; ECF No. 20-15, ¶¶ 9–10; ECF No. 20-16, ¶¶ 9–13; ECF No. 20-17, ¶¶ 7, 16; ECF No. 20-19, ¶¶ 9–10; ECF No. 20-20, ¶¶ 12, 24–26; ECF No. 20-21, ¶¶ 7–12. Accordingly, all eighteen U.S. Citizen Plaintiffs have established Defendant's liability under Section 1605A(c) for IIED.

*2. Non-U.S. Citizen Plaintiff without a Cause of Action Under 1605A(c)*

The remaining Plaintiff, Betsy Laliberte, is the mother of Marc Laliberte and a citizen of Canada. ECF No. 20-18, ¶¶ 1–2. As a result, she does not have access to the cause of action under § 1605(c) and must rely on either state or foreign law. *See* § 1605A(c); *see also Fritz I*, 320 F. Supp. 3d at 89 (applying the pass-through approach for foreign family members who were not able to proceed under the cause of action permitted under 1605A(c)).

*a. Choice of Law*

To determine whether Betsy has established liability, the court must first determine "which jurisdiction's substantive law to apply," *Oveissi v. Islamic Republic of Iran*, 573 F. 3d 835, 841 (D.C. Cir. 2009), and then evaluate whether she has offered "admissible evidence sufficient to substantiate the essential elements of her claim" under that law. *Fritz I*, 320 F. Supp. 3d at 76. Three potential sources of law could govern Betsy's claim: the law of the forum state (District of Columbia), the law of Betsy's domicile (Canada), or the law of the place where Marc's injuries occurred (Afghanistan). In determining which law to apply, courts apply the choice of law rules of the forum state, in this case Washington, D.C. *Przewozman v. Islamic Republic of* Iran, 754 F. Supp. 3d 1, 25 (D.D.C. 2024).

Under D.C. choice of law rules, the court first determines if there is a true conflict between the laws of the forum and alternate jurisdictions and then applies a combined "governmental interests analysis" and "most significant relationship test." *Oveissi,* 573 F. 3d at 842. The governmental interest analysis examines "governmental policies underlying the applicable laws" to "determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Id.* (citing *Hercules & Co., Ltd v. Shama Restaurant Corp*, 566 A. 2d 31, 41 (D.C. 1989). The most significant relationship test examines factors from the Restatement Second of Conflict of Laws § 145 including: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2) (1971). The Restatement also accounts for factors including "certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied." *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224, 2005 WL 756090, at *18 (D.D.C. Mar. 29,

2005) (citing Restatement (Second) of Conflict of Laws § 145 (1971)). "Generally, the Court will use the law of the forum state, 'unless the foreign state has a greater interest in the controversy.'" *W.A.,* 427 F. Supp. 3d at 139 (quoting *Owens*, 826 F. Supp. 2d at 154).

Applying the governmental interests test, although the injury occurred in Afghanistan where Marc was serving, evidence from Mr. Barker's expert report indicates that Marc was targeted because of his status as a U.S. citizen and soldier. ECF No. 20-3, ¶ 15 ("the placement of the device… suggested intentional targeting of American service members"). And, the United States has a "unique interest" in applying domestic law in terrorism cases in which individuals are targeted because of their U.S. citizenship. *Dammarell*, 2005 WL 756090, at *20; *see* Restatement (Third) of Foreign Relations Law § 402(3) (1987); *Wang v. Islamic Republic of Iran*, No. 22-cv-583, 2025 WL 785736, at *10 (D.D.C March 12, 2025). And it is that "unique interest" that has been deemed dispositive of the analysis under the governmental interest test. In *Fritz I*, for example, when determining whether to apply the law of D.C. (the forum), Iraq (the location of the attack), or Canada (the location of plaintiff's domicile), the court applied D.C. law because of the strong U.S. interests in overseas attacks targeting U.S. citizens. 320 F. Supp. 3d at 89–91. Similarly, in *Dammarell* the court applied U.S. law rather than Lebanese law in a case brought by U.S. victims of the 1983 Beirut bombing because the attack was directed at U.S. embassy and personnel. 2005 WL 756090, at *20. In this case, although the Attack occurred in Afghanistan, the injuries here, as in *Dammarell* and *Fritz,* are a result of a state-sponsored terrorist attack directed towards U.S. nationals which "elevate the interests of the United States to nearly it [sic] highest point." *Id.* Therefore, the governmental interest analysis weighs in favor of applying D.C. law.

Application of the most significant relationship test is less clear. Factor one—the place of injury—points in multiple directions. On the one hand, some courts use the place where emotional

injury occurred. *See Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 135 (D.D.C. 2019). Although Betsy is a Canadian citizen, she does not explicitly state where she resided when the emotional injury occurred. On the other hand, some courts have interpreted place of injury as the location where the terrorist attack occurred, which here would point to Afghanistan. *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 49 (D.D.C. 2020). Factor two—the place of conduct causing injury—is more straightforward and points to Afghanistan. Factor three—the domicile or nationality of the parties—could point to Canada as Betsy is a Canadian citizen, or to the U.S. as the remaining parties in the case reside in the U.S. ECF No. 20-18, ¶ 1. The fourth and final factor—the place where the parties' relationship is centered—does not point clearly towards any given location, as the place where the relationship between Betsy and Defendant is centered could be Afghanistan, where her son was at the time he was injured, or Canada, her place of citizenship. *See Barry*, 437 F. Supp. 3d at 50 (finding the relationship between parties did not cut in any specific direction for family members of victims residing outside of the U.S.). However, these factors are not the only consideration. Courts also weigh "certainty, predictability, and uniformity of result." Restatement (Second) of Conflict of Laws § 145 (1971); *see also Barry*, 437 F. Supp. 3d at 47. In *Abedini*, when determining whether to apply the law of D.C., Iran, or the domicile of the plaintiff, the court found the most significant relationship test provided "little guidance" and "unhelpfully point[ed] in multiple directions." *Abedini*, 422 F. Supp. 3d at 135. Instead, the court turned to "certainty, predictability, and uniformity of result" and applied D.C. law "to ensure consistency and predictability amongst . . . family members." *Id.*

This case presents similar considerations to *Fritz, Dammarell,* and *Abedini*, as the Attack targeted U.S. citizens. Therefore, consistent with the policy purpose of the FSIA, goals of uniformity, and consistency with other FSIA cases, D.C. law should apply. *See also Owens*, 826 F.

Supp. 2d at 155 ("Consistent with *Dammarell* and other FSIA cases, United States domestic law remains more appropriate in state-sponsored terrorism cases than foreign law"); *Hammons v. Islamic Republic of Iran*, Nos. 19-cv-2518, 20-cv-1058, 2023 WL 5933340, at *24–25 (D.D.C. July 24, 2023) (applying D.C. law to ensure consistency and predictability for family members of terrorist victims).

*b. Liability under D.C. Law*

Once it is determined that D.C. law applies, the court examines Betsy's theory of liability—IIED—under the relevant law. D.C. law parallels the Restatement elements with regard to IIED claims. *See Republic of Sudan v. Owens*, 194 A.3d. 38, 41 (D.C. 2018) (affirming that court and other D.C. state courts have "embraced the Restatement Second's approach to IIED liability"); *see also Barry*, 437 F. Supp. 3d at 50-51. Therefore, the IIED analysis for Betsy is the same as the IIED analysis for the other U.S. Family Member Plaintiffs. *See supra* Section III.C.1.c.

Betsy's IIED claim satisfies the test. She presented evidence that the Attack caused her "devastating sadness" as she grappled with the impact of her son's injuries, especially since he served as her caretaker prior to his deployment. ECF No. 20-18, ¶¶ 7–11. Therefore, Betsy has established liability under D.C. law for IIED.

**D. Damages**

All Plaintiffs having established liability under the FSIA for the Attack, now comes the "undeniably difficult" matter of quantifying their damages. *Heiser I*, 466 F. Supp. 2d at 269. The FSIA's terrorism exception authorizes courts to award plaintiffs "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Here, Plaintiffs seek pain and suffering and economic damages for Servicemember Plaintiffs, solatium damages for the Family Member Plaintiffs, as well as general punitive damages. ECF No. 20-2 at 50–52.

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries in similar cases. *See Reed*, 845 F. Supp. 2d at 213–14.

Here, Plaintiffs' have shown that their emotional distress and injuries were reasonably certain to occur because of Iran's actions supporting the Taliban. *See Roth*, 78 F. Supp. 3d at 394 (stating that the FSIA sets a "relatively low" bar for proximate cause). As outlined above, Plaintiffs presented expert testimony establishing "that the Attack was completed as the direct and proximate result of material support and resources provided to the Taliban by Iran." ECF No. 20-3, ¶ 25; *see supra* Section III.A.4. Accordingly, Plaintiffs have proven that "the consequences of the foreign state's conduct were 'reasonably certain' . . . to occur" and the undersigned turns to determining the appropriate amount of damages to be awarded. *See Roth*, 78 F. Supp. 3d at 402 (quoting *Salazar*, 370 F. Supp. 2d at 115–16).

As court after court has noted, determining a monetary award to compensate a victim of mistreatment at the hands of a foreign sovereign is "difficult." *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883, 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005)), *report and recommendation adopted*, 2020 WL 7869211 (D.D.C. Apr. 11, 2020). Because "there is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be

definitely ascertained," *id.* (quoting *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 22 (D.D.C. 2002)), to comply with the mandate "that 'individuals with similar injuries receive similar awards,'" *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145,163 (D.D.C. 2017) (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57,70 (D.D.C. 2015)), courts must engage in the rather macabre exercise of determining whether the suffering endured by one individual subjected to repellent mistreatment by a state sponsor of terror is greater than or less than that endured by another who was also subjected to similar mistreatment. But no matter how distasteful, that is the undersigned's task.

*1. Pain and Suffering Damages*

Turning to compensatory damages, the amount of damages for physical and mental injuries in FSIA cases depends upon a variety of factors, including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006) (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 73 (D.D.C. 2006). Plaintiffs request $10 million in pain and suffering damages for John Stanz and Jason Roberts, and $8 million for Marc Laliberte. ECF No. 20-2 at 23–25. The undersigned addresses those requests in turn.

Courts in this District have adopted a general framework for the calculation of damages that includes a baseline damages award of $5 million in compensatory damages to persons suffering substantial injuries in terrorist attacks. *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016). However, courts will "depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead" and will "depart downward to $2–$3 million where victims suffered

only minor shrapnel injuries or minor injury from small-arms fire." *See Valore*, 700 F. Supp. 2d at 84. In the interests of promoting consistency and ensuring that similar harm merits similar damage awards, this framework will be utilized here.

Courts in this District have also used VA disability ratings as a "rubric" to determine upward departures under this framework. *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74–75 (D.D.C. June 27, 2019); *see also Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 93 (D.D.C. 2023) (noting "the Court placed added weight on disability ratings assigned by objective medical professionals at the Department of Veterans Affairs" when determining damages awards). The VA disability rating provides a damages approach "that is generally agnostic to the mental or physical nature of the injury and further provides a relatively objective measure of comparative injuries." *Schooley,* 2019 WL 2717888, at *74. Under this approach, plaintiffs with up to a 30 percent disability rating receive the baseline award of $5 million, 40–60 percent disability rating receive $6 million, and 70-100 percent rating receive $7 million. *Id.* at 75; *Thole v. Islamic Republic of Iran*, No. 23-cv-793, 2024 WL 2208208, at *14 (D.D.C. May 16, 2024); *Boothe v. Islamic Republic of Iran*, No. 22-cv-1747, 2026 WL 809887, at *14 (D.D.C. Mar. 24, 2026) (finding the use of a disability rating rubric a "sensible approach" to determining damages). Here the three Servicemember Plaintiffs each have a 100 percent disability rating. ECF No. 20-22 at 2, 17, 33.

It is also informative to compare prior awards in terrorism cases. In *Cabrera*, the Court awarded $9 million to another servicemember plaintiff who spent over four years in the hospital, underwent multiple amputation surgeries, and suffered from a high risk of "devastating seizures." *Cabrera I*, 2022 WL 2817730, at *45. In *Valore*, a soldier who survived the 1983 Beirut bombing, was granted an upward departure from the $5 million baseline to $7.5 million; he suffered burns

on 90 percent of his body, shrapnel wounds, and a split leg. *Valore*, 700 F. Supp. 2d at 84. Similarly, a victim in *Peterson v. Islamic Republic of Iran ("Peterson II")* was awarded $7 million; he suffered a shrapnel wound that destroyed part of his nose, cuts to the head and back, a perforated eardrum, and severe lasting psychological problems from the attack. 515 F. Supp. 2d, 25, 55 (D.D.C. 2007). On the other hand, the court awarded the baseline $5 million in *Wamai v. Republic of Sudan* to a bombing victim who was knocked unconscious and sustained shrapnel wounds, burns, emotional trauma, hearing loss, and two amputated fingers. 60 F. Supp. 3d 84, 92–93 (D.D.C. 2014), *aff'd in part, vacated in part on other grounds sub nom*. *Owens*, 864 F.3d at 825, *vacated sub nom*. *Opati*, 590 U.S. 418. And the court in *Wamai* departed downward to a $2.5 million award for another victim of a bombing who suffered minor lacerations and partial vision impairment. *Id.* at 92.

The requested amounts of $10 million for John and Jason and $8 million for Marc are substantial upward departures from the $5 million baseline amount which, by design, was deemed sufficient to compensate terrorist attack victims whose injuries are often very severe and life altering. As indicated in the examples above, prior cases awarding damages in the range Servicemember Plaintiffs' request—$8–10 million—have involved victims who have suffered extremely severe injuries. While substantial, the injuries suffered by the Servicemember Plaintiffs are not so severe as to warrant an upward departure as high as $10 million. Though it pains the Court to make such comparisons, none of them were hospitalized near as long as the soldier at issue in *Cabrera,* none of them suffered from the multiple amputations that he did or from the devastating seizures he will suffer for his lifetime. *See* ECF No. 20-4, ¶¶ 10, 15-18 (following the Attack, John was in a coma for fifty-two days, and has significant ongoing physical and emotional challenges that has altered his life and created "turmoil" within his family); ECF No. 20-9, ¶ 18 (John had to

relearn how to walk, eat, and use the bathroom after he awoke from his coma); ECF No. 20-6, ¶¶ 10–12, 14–18 (Jason sustained significant injuries resulting in his hospitalized for eight months and the amputation of his leg below the knee, struggles to connect with others socially or emotionally, and remains in constant pain requiring daily personal and medical assistance); ECF No. 20-5, ¶¶ 15–20, 23 (Marc sustained injuries including multiple fractures and burns across 40 percent of his body requiring his hospitalization for four months, and which have permanently altered his appearance and caused emotional trauma that have impacted his familial relationships, including leading to an eventual divorce). That said, the Servicemember Plaintiffs have suffered greatly, and, in the undersigned's view, more so than the average surviving victim of a terrorist attack. Each will continue to suffer the effects of their injuries for their lifetime and have received disability ratings of 100 percent. ECF No. 20-22 at 2, 17, 33. For all these reasons, the undersigned recommends an award of $7 million to each Servicemember Plaintiff to compensate them for physical and mental pain and suffering caused by the Attack.

*2. Economic Compensatory Damages*

"As a general rule, lost earnings—past and future—are compensable economic damages" under the FSIA. *Abedini*, 422 F. Supp. 3d at 138 (citing *Moradi*, 77 F. Supp. 3d at 71 (citing Restatement (Second) of Torts § 906)). Traditionally, to establish economic loss, plaintiffs submit a forensic economist's expert report. *See, e.g.*, *Roth*, 78 F. Supp. 3d at 402; *Fritz v. Islamic Republic of Iran* ("*Fritz II*"), 324 F. Supp. 3d 54, 59–60 (D.D.C. 2018); *Valore*, 700 F. Supp. 2d at 83. When evaluating an expert's report related to lost future earnings, the Court must consider the "reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed*, 845 F. Supp. 2d at 214).

The Servicemember Plaintiffs submitted expert reports by Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies calculating economic loss resulting from their

injuries. ECF No. 20-22. Staller and Dripps were previously found qualified by this Court as "experts in the field of economic loss computations." *Coombs v. Islamic Republic of Iran*, No. 19-cv-3363, 2023 WL 12194269, at * 2 (D.D.C. Nov. 6, 2023); *Selig*, 573 F. Supp. 3d at 65. Staller and Dripps are "certified valuation analysts" with academic credentials and previous experience in FSIA cases. ECF 20-2 at 45. To calculate economic loss, the experts reviewed relevant, reliable data including Plaintiffs' Social Security earnings, veteran's benefits summaries, and declarations. ECF No. 20-22 at 1, 16, 32. Like in *Coombs* and *Selig*, the undersigned finds Staller and Dripps qualified as experts in economic loss computations and their estimates based on reliable principles and methods pursuant to Federal Rule of Evidence 702.

The reports reasonably assume that absent the Attack, the Servicemember Plaintiffs would have completed twenty years of active-duty military service, the minimum number of active-duty years necessary to qualify for pension. ECF No. 20-22 at 2, 17, 33. Using Military Pay Charts, Staller and Dripps calculate lost earnings assuming completion of twenty years of active duty. *Id.* at 4, 19, 35. Post-military service earnings are calculated using average earnings data from the Census based on Servicemember Plaintiffs' levels of education. *Id.* After calculating military and post-military earnings, the reports account for past earnings growth, future earnings growth, pension and retirement benefits, the deduction of state and federal taxes, and the deduction of any wages actually earned by the Servicemember Plaintiffs following the Attack. Past earnings growth for military earnings is calculated based on military pay tables. ECF No. 20-22 at 5, 20, 36. Future earnings growth is calculated using the average annual rate of change in hourly earnings for workers in the respective metropolitan areas where the Servicemember Plaintiffs reside. *Id.* Each factor is summed to calculate a present value estimate of lost earnings. The undersigned finds this

methodology reasonable and well supported. *See Selig*, 573 F. Supp. 3d at 68 (accepting Staller and Dripps's economic loss calculation when they similarly accounted for relevant factors).

Staller and Dripps provide the economic loss estimate based on two scenarios. ECF No. 20-22 at 12–13, 27–28, 43–44. The first uses a calculated statistical work life expectancy of 61.5 for John, 64.2 for Marc, and 57.9 for Jason. ECF No. 20-22 at 3, 18, 34. The second assumes that Servicemember Plaintiffs would work until the social security retirement age, currently 67. *Id.* Conforming to a number of cases from this District, it is reasonable to assume that the Servicemember Plaintiffs would work until the age of 67. *See, e.g., Selig*, 573 F. Supp. 3d at 68 (awarding the higher range of economic loss given the likelihood that plaintiff "would have worked until at least age 67") ; *Coombs v. Islamic Republic of Iran*, No. 19-cv-3363, 2023 WL 4894939, at *15 (D.D.C. July 5, 2023) (recommending adoption of "the calculation that applies the social security retirement as for the work life assumption [as] the most reasonable under the circumstances"), *special master's report and recommendation adopted*, 2023 WL 8651170 (D.D.C. Nov. 6, 2023); *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193, 2022 WL 17370239, at *14 (D.D.C. Sept. 8, 2022) ("Given '[c]urrent trends indicating that individuals are more likely to work beyond the average work life,' courts in this District have previously opted for the social security retirement age because it yields a later retirement age.") (alteration in original) (quoting *Fritz v. Islamic Republic of Iran*, No. 15-cv-456, 2018 WL 5046229, at *17 (D.D.C. Aug. 13, 2018)), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sep. 30, 2022); *Azadeh v. Islamic Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *22 (D.D.C. Sep. 5, 2018) (basing an award of lost earnings on the assumption that the plaintiff would work until her "Social Security retirement age of 67"). There is no reason to believe that, but for the injuries they sustained in the Attack, the Servicemember Plaintiffs would not have worked until the social security retirement age.

Accordingly, the undersigned recommends awarding the higher range of economic loss assuming the social security retirement age of 67.

Staller and Dripps also quantify the value of lost household services the Servicemember Plaintiffs would have provided but for their injuries. ECF No. 20-22 at 7, 22, 38. They use data from the 2023 American Time Use Survey estimating the number of weekly hours an individual spends performing household services, dependent on "1) their employment status, 2) the presence or absence of dependents in the household, and 3) the age of the youngest dependent." *Id.* Using estimated hours from the survey, Staller and Dripps assume the Servicemember Plaintiffs would provide household assistance for the remainder of their statistical lifespan. *See id.* The number of estimated hours is then multiplied by the "average hourly wage for representative household production occupations" in the respective metropolitan areas where each Servicemember Plaintiff resides. *Id.* For John, who has one dependent child under age eighteen, estimated weekly hours are 17.71 while he is working with dependent children at home, then drop to 13.02 when he no longer has dependents. ECF No. 20-22 at 7. For Marc, who has four children, one of whom is under age eighteen, estimated weekly hours vary between 17.71 while his son is under eighteen, 13.02 when he is working with no dependent children, and 21.98 after retirement. ECF No. 20-22 at 22. For Jason, who has no children, estimated weekly hours prior to retirement are 13.02 and 21.98 after retirement. ECF No. 20-22 at 38. The resulting number is added to each Servicemember Plaintiff's damages, totaling $465,529 in lost household services for John, $258,748 for Marc, and $385,676 for Jason. ECF No. 20-22 at 10, 25, 41. Consistent with other cases, the undersigned finds the calculation of lost household services reasonable and well supported. *See, e.g., M.M. v. Islamic Republic of Iran*, 708 F. Supp. 3d 22, 49–50 (D.D.C. 2023) (accepting similar calculation of lost household services recoverable as economic loss in FSIA case).

Less successful, Staller and Dripps calculate something they call "the lost investment opportunity on damages incurred through 2025." ECF No. 20-22 at 8, 23, 39. The experts provide no additional explanation for this calculation, nor do they explain why the assumptions underlying it are reasonable. Importantly, there is also no evidence provided by the Servicemember Plaintiffs that they would have invested past damages, whatever they may be. Because the experts must rely on "reasonable and well-founded assumptions," *Reed*, 845 F. Supp. 2d at 214, and because the court can exercise "sound discretion" in this regard, *M.M.,* 708 F. Supp. 3d at 52, the undersigned finds there is insufficient support to award "the lost investment opportunity on past damages." *See M.M.,* 708 F. Supp. 3d at 52 (rejecting a higher economic loss estimate when the assumptions were based on "guesswork, not evidence"). These amounts—$221,809 for John, $92,986 for Marc, and $127,167 for Jason should therefore be subtracted from Staller and Dripps lost earnings calculations for the Servicemember Plaintiffs. *See* ECF No. 20-22 at 11, 26, 42.

All in, and with the above referenced adjustments, the total amount of economic damages that should be awarded for each Servicemember Plaintiff are:

- John Stanz: $3,956,666 (Lost Earnings of $4,178,475 less Lost Investment Opportunity on Past Damages of $221,809) + $465,529 (Household Services) = $4,422,195
- Marc Laliberte: $2,494,845 (Lost Earnings of $2,587,831 less Lost Investment Opportunity on Past Damages of $92,986) + $258,748 (Household Services) = $2,753,593
- Jason Roberts: $3,961,672 (Lost Earnings of $4,088,839 less Lost Investment Opportunity on Past Damages of $127,167) + $385,676 (Household Services) = $4,347,348

*3. Solatium Damages*

"Common law claims of IIED provide for the same relief as the solatium claims pleaded by [plaintiffs] under § 1605A(c)." *W.A.*, 2020 WL 7869218, at *13 (citing *Valore*, 700 F. Supp. 2d

at 85). Here, the Family Member Plaintiffs have made successful claims for IIED based on their relation to the Servicemember Plaintiffs. *See supra* Sections III.C.1.C; III.C.2.b.

To determine Family Member Plaintiffs' IIED/solatium damages, the undersigned will follow the "majority of courts in this district [which] have adopted" the framework set forth in *Heiser I* to determine how to quantify the emotional harm caused to family members by terrorist acts. *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2021 WL 723257, at *8 (D.D.C. Feb. 24, 2021)*; see Heiser I*, 466 F. Supp. 2d at 269; *see also Peterson II*, 515 F. Supp. 2d at 54 ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards."). "Under that framework, 'a spouse, child, or sibling may receive $4 million, $2.5 million and $1.25 million, respectively, for valid claims in which the family member survived the terrorist act.'" *Id.* (quoting *Reed*, 845 F. Supp. 2d at 214); *see also Kar v. Islamic Republic of Iran*, Nos. 19-cv-2070, 19-cv-2602, 2022 WL 4598671, at *18 (D.D.C. Sep. 30, 2022) (noting that under the *Heiser* and *Peterson II* frameworks, "the standard damages awards for the immediate family members of a deceased victim are $5 million for parents, $2.5 million for siblings, $8 million for spouses, and $5 million for children. Those awards are typically halved for family members of an injured victim.") (internal citation omitted) (quoting *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 270 (D.D.C. 2020)). "The framework has gained strong precedential support as other members of this court have repeatedly continued to follow it in FSIA cases." *Reed*, 845 F. Supp. 2d at 214; *see also Kar*, 2022 WL 4598671, at *18 (applying the *Heiser/Peterson II* framework to determine the measure of solatium damages); *Cabrera I*, 2022 WL 2817730, at *45 (noting that "recent decisions hew close[ly] to the *Peterson II* framework" and citing cases); *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361 (D.C. Cir. 2018) ("We recognize that many FSIA decisions issued by the District Court follow *Heiser*'s solatium damages model."); *Braun*, 228 F. Supp. 3d

at 85 (describing the *Heiser* framework as "a commonly accepted standardized framework . . . for solatium damages"); *Valore*, 700 F. Supp. 2d at 85–86 (noting "strong precedential support" for the *Heiser* framework).

All that said, nothing requires this Court to apply *Heiser*'s damages matrix, *see Fraenkel*, 892 F.3d at 361 ("We decline to impose *Heiser*'s framework as a mandatory scheme under the FSIA."), and even when *Heiser* is used, the "numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances." *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *26 (D.D.C. July 2, 2020); *see also Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'") (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017), *rev'd on other grounds*, 892 F.3d 348 (D.C. Cir. 2018)). Although there are myriad reasons why courts may elect to deviate from the *Heiser/Peterson II* framework, situations in which courts have awarded higher IIED/solatium damages include where "family members had an extraordinarily close relationship to the victim; (2) [where] the family member's emotional trauma was particularly severe; and (3) [where] the circumstances of the attack made the suffering particularly agonizing for the family." *Abedini*, 422 F. Supp. 3d at 140 (internal citations and quotation marks omitted). In the interests of promoting consistency and ensuring that similar harm merits similar damage awards, this Court will apply the *Heiser/Peterson II* framework and deviate from it if appropriate. *See Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 58 (D.D.C. 2018) (adopting the *Heiser* framework "in the interest of consistency"); *see also Kar*, 2022 WL 4598671, at *18 (noting that judges in this Circuit have applied the *Heiser/Peterson II* framework "[t]o bring some uniformity" to the damages awards in

cases under the FSIA's terrorism exception); *Peterson II*, 515 F. Supp. 2d at 54 ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards."). The undersigned does so with the understanding that *Heiser* is not binding.

Some of the Family Member Plaintiffs have requested upward departures ranging from 20 to 80 percent above the *Heiser* framework baseline of $4 million for a spouse, $2.5 million for a child, and $1.25 million for a sibling of a surviving victim of a terrorist attack. The undersigned is sympathetic to all of the Plaintiffs in this action and in no way means to minimize the intense suffering they have endured as a result of the Attack. Nevertheless, "the *Heiser* baseline accounts for this type of suffering." *Selig*, 573 F. Supp. 3d at 66. The significant baseline amounts are "designed to reflect the fact that a traumatic terrorist attack generally has a severe emotional impact on the close family of victims." *Boothe*, 2026 WL 809887, at *17. Upward enhancements are typically granted to family members only when there is "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

Additionally, courts "may depart downward in amount where the relationship between the claimant and the decedent is more attenuated." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). In *Valore*, Judge Lamberth awarded downward departures to family members whose relationships with the victim were "attenuated." 700 F. Supp. 2d at 87. For example, a sibling who had a significant age difference with the victim and lost touch with him over the years was granted a 50 percent downward departure from the baseline. *Id.* In *Cabrera II*, Judge Bates issued downward departures for family members whose "relationship with a direct

victim was further removed than traditionally expected." *See Cabrera v. Islamic Republic of Iran* ("*Cabrera II*"), Nos. 19-cv-3835, 18-cv-2065, 2023 WL 3496303, at *10 (D.D.C. May 16, 2023). For example, children who had either never met or were too young to have memories of their family member victims received downward departures of between 40 and 70 percent of the baseline. *Id.* at 10–11.

Applying these principles, the undersigned recommends that the majority of Family Member Plaintiffs be awarded baseline solatium amounts; in a few cases, the undersigned recommends modest downward adjustments from the baseline.

*a. Family of John Stanz*

John's father, John C. Stanz, describes his relationship with John prior to the Attack as "an outstanding father-son relationship." ECF No. 20-7, ¶ 4. John C. received a call about the bombing shortly after learning that his wife was hospitalized due to an unexpected heart attack. *Id.*, ¶ 8. He supported John in the aftermath of the Attack, spending time with him in the hospital through his coma and subsequent recovery process. *Id.*, ¶ 12. Following John's recovery, John C. has observed his son's physical and mental injuries damage familial relationships stating that "Johnny and the people around him continue to suffer." *Id.*, ¶ 16. John C. seeks a 60 percent upward departure from the baseline. ECF No. 20-2 at 28. However, nothing in the evidence provided suggests unusually severe circumstances compared to other parents whose children have been injured in terrorist attacks. Thus, consistent with the *Heiser* framework and given the responsibility to "ensure that individuals with similar injuries receive similar awards," the undersigned recommends awarding John C. the baseline amount of $2.5 million for the parent of a surviving victim of a terrorist attack. *Valore*, 700 F. Supp. 2d at 84 (quoting *Peterson* II, 515 F. Supp. 2d at 54).

Lisa Destro, one of John's older sisters, also requests an upward departure of 60 percent for the emotional suffering she experienced after the bombing, including "several stays in mental

health hospitals, the longest of which lasted almost three weeks." ECF No. 20-8, ¶ 9. After the Attack, Lisa experienced anxiety and panic attacks requiring medication which she still takes "to this day," as well as visits to a counselor and psychiatrist to "cope with the mental health issues [she] started having after the bombing." *Id.*, ¶¶ 8–9. The undersigned finds that Lisa's particularly severe suffering—specifically, her three-week hospitalization in a mental hospital following the Attack—warrants an upward departure. In *Valore*, the sister of a surviving victim was awarded an upward departure of 25 percent based on her emotional suffering that included "several nervous breakdowns, at least one of which required hospitalization." *Valore*, 700 F. Supp. 2d 52 at 86. Consistent with that case, the undersigned recommends a 25 percent upward departure for Lisa, for a total solatium amount of $1,562,500.

The remainder of John's siblings, Stacy Waite, Amy Pavlovich, Tara Archfield, Cassie Stronz, and Joseph Stanz request substantial upward departures. They each demonstrate close and loving relationships with John, and state that his injuries have affected every part of their lives. ECF Nos. 20-9 through 20-13. While each has no doubt suffered greatly, their experiences are "consistent with that suffered by many siblings of terrorist victims" whose lives are impacted following an attack. *Cabrera I*, 2022 WL 2817730, at *53. Therefore, the undersigned recommends John's other siblings, aside from Lisa, receive the baseline amount of $1.25 million each.

*b. Family of Marc Laliberte*

At the time of the Attack, Marc was married to Juliette Laliberte. Juliette provided an affidavit detailing how the Attack and Marc's injuries fundamentally altered their marriage. ECF No. 20-14, ¶¶ 19–27. She experienced anxiety and panic attacks requiring psychiatric treatment (though not hospitalization). *Id.*, ¶ 24. Though they divorced in 2012, three years after the Attack, Juliette is still entitled to recover FSIA damages. Juliette attributes the divorce to the Attack, explaining that Marc's injuries, including PTSD, led to paranoia and controlling behavior that

deteriorated their relationship. *Id.*, ¶¶ 22, 26–27. Other courts in this District have determined that when "a couple eventually divorced but remained married for years following the attack and the spouse 'suffered compensable emotional trauma' the *Heiser* solatium framework may still be applied." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859, 2023 WL 5221955, at *34 (D.D.C. Aug. 15, 2023) (citing *Spencer v. Islamic Republic of Iran,* 71 F. Supp. 3d 23, 28–29 (D.D.C. 2014)). Therefore, the undersigned recommends awarding Juliette the baseline solatium amount for spouses of injured family members, to compensate her for her suffering in the years following the Attack and for the negative impact it had on her marriage to Marc.

At the time of the Attack Marc and Juliette's sons, H.L. and James Laliberte, were three months and three years old, respectively. Following their parents' divorce in 2021, the boys do not see Marc often, "typically spend[ing] four to five weeks a year" with him. ECF No. 20-14, ¶ 32. However, the impact of Marc's injuries and the resulting divorce of their parents have caused them significant distress. *See* ECF No. 20-17, ¶¶ 7–16. James requests a 20 percent upward departure. ECF No. 20-2 at 40. H.L. requests the baseline amount. *Id.* Although H.L. and James have suffered because of their father's injuries, their suffering is "similar to that of children who have been awarded the Peterson II baseline amount of damages." *Cabrera I*, 2022 WL 2817730, at *50 (finding baseline damages appropriate for children facing emotional trauma from loss of their father); *see also Winternitz v. Syrian Arab Republic*, No. 17-cv-2104, 2022 WL 971328, at *10–11 (D.D.C. Mar. 31, 2022) (awarding baseline damages to children who suffered "mental anguish" due to a parent's injury). Given these awards granted in similar cases, and H.L. and James's very young ages at the time of the Attack, the undersigned recommends awarding each a baseline amount of $2.5 million.

As explained above, downward departures from the *Heiser* framework may be appropriate where a relationship is attenuated, or where the injured plaintiff plays a "comparatively smaller" parental role. *See Cabrera I*, 2022 WL 2817730 at *50. Marc's twin daughters from a previous marriage, Shyanne and Julia Laliberte, did not live with their father at the time of his injury. *See* No. ECF 20-15, ¶ 6; ECF No. 20-16, ¶ 4. They did not learn about the Attack for several months following Marc's return to the U.S. because "he was remarried by that time." ECF No. 20-15, ¶ 8; ECF No. 20-16, ¶ 7. Additionally, Marc and Shyanne "did not talk for over a year" during his recovery and rehabilitation. ECF 20-15, ¶ 10. While Marc's daughters were no doubt "consumed with fear and anxiety" for their father's wellbeing after learning of the Attack, ECF No. 20-16, ¶ 10, his role in their lives "was comparatively smaller" than in the lives of H.L. and James. *Cabrera I*, 2022 WL 2817730, at *50. Consistent with downward departures given to children of victims in *Cabrera*, the undersigned recommends granting an award of $2 million (20 percent below the baseline) each for Shyanne and Julia. *See Cabrera I*, 2022 WL 2817730, at *50 (awarding 20 percent downward departures for two children of a victim who did not live with their father before his death, even though he was still involved in their lives).

Marc's mother, Betsy, requests a baseline award of $2.5 million. ECF No. 20-2 at 41. Upon learning about the Attack, Betsy "was immediately physically and emotionally distressed." ECF No. 20-18, ¶ 8. The impacts of the Attack and Marc's injuries continue to cause her "devastating sadness." *Id.*, ¶ 11. The undersigned concludes that Betsy is entitled to the baseline award.

John Laliberte, Marc's brother, also requests a baseline award of $1.25 million. ECF No. 20-2 at 42. As medical power of attorney, John made "several difficult decisions" regarding Marc's care and treatment. ECF No. 20-19, ¶ 8. The Attack also negatively impacted John's familial relationships. *Id.*, ¶ 10. The undersigned concludes John is entitled to the baseline award.

*c. Family of Jason Roberts*

Christina Roberts, Jason's wife, seeks solatium damages for the emotional and familial impacts of her husband's injuries. ECF No. 20-2 at 44. Christina describes the day she learned about the Attack as "the worst day of [her] life." ECF No. 20-20, ¶ 9. She supported Jason while he made the difficult decision to amputate his leg and continues to act as his primary caretaker. *Id.*, ¶¶ 14, 25. Because of the emotional stress, Christina lost "an enormous amount of weight" and struggles with "bouts of depression." *Id.*, ¶¶ 24–25. Christina requests a 30 percent upward departure. ECF No. 20-2 at 44. Although Christina has undoubtedly suffered, she has "presented no evidence of a unique circumstance that differentiates her suffering from the pain most spouses endure when they lose the one they love, especially in a terrorist attack." *Selig*, 573 F. Supp. 3d at 69. In *Baker*, the court found standard damages appropriate for spouses whose "husbands' injuries fundamentally altered the nature of their marriages, turning the plaintiff spouses from equal partners to caregivers." 2025 WL 2480075, at *26; *see also Cabrera I*, 2022 WL 2817730, at *49 (declining to award an upward departure to the spouse of a deceased servicemember who failed to present evidence of unique circumstances warranting an upward shift). Therefore, the undersigned recommends awarding Christina the baseline amount of $4 million for spouses of individuals injured in terrorist attacks.

John Roberts, Jason's younger brother, seeks the baseline solatium award for siblings of terrorist victims. John explains that Jason's injuries caused him to spiral as he "could not control [his] emotions." ECF No. 20-21, ¶ 7. Despite seeking medical help for the emotional trauma, John feels that to this day "nothing has truly resolved." *Id.*, ¶ 14. The undersigned recommends awarding John the baseline amount for siblings of terrorist victims of $1.25 million.

*4. Punitive Damages*

"Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012). "Four factors are relevant in deciding the level of punitive damages appropriate in a given case: '(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" *Selig*,, 573 F. Supp. 3d at 75 (quoting *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910, 2019 WL 6117722, at *9 (D.D.C. Nov. 18, 2019)).

Here, each of those factors counsels in favor of awarding punitive damages. The Attack was designed to, and did, cause immense pain and suffering to U.S. soldiers. Further, there is a "substantial need to deter Iran from further supporting terrorist attacks against American victims." *Cabrera I*, 2022 WL 2817730, at *56. Finally, the defendant, "as [a] state actor[ ], can be presumed to possess significant wealth." *Christie*, 2020 WL 3606273, at *21; *see also Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016) ("Iran is a sovereign and has substantial wealth.").

There are several potential methods to calculate punitive damages in FSIA cases. "The first is to 'multiply the foreign state's annual expenditures on terrorism by a factor between three and five.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Braun*, 228 F. Supp. 3d at87). The second method is to award each plaintiff $150 million. *See*, *e.g.*, *Levinson v. Islamic Republic of Iran*, No. 17-cv-511, 2020 WL 5834839, at *2 (D.D.C. Oct. 1, 2020). "Third, some courts in this district have calculated the total compensatory damages awarded for a victim and then multiplied that award 'by a factor between one and five.'" *Selig*, 573 F. Supp. 3d at 76 (quoting *Fritz II*, 324 F. Supp. 3d at 65).

Plaintiffs do not request that the Court apply the first approach, nor do they provide an estimate of Iran's wealth or its annual expenditures on terrorism. The undersigned therefore declines to recommend the first approach. *See id.* at 76. Likewise, the undersigned will not recommend a flat $150 million in punitive damages. "As this Court and others have explained, . . . the $150 million figure is most appropriate in cases where the victim of terrorism has died" in the attack. *Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599, 2023 WL 4684929, at *26 (D.D.C. July 6, 2023); *see also Doe*, 2020 WL 5422844, at *17 (rejecting the $150 million lump sum approach because it "is typically used in cases where, unlike here, at least one of the plaintiffs dies"). The undersigned declines to recommend awarding Plaintiffs $150 million in punitive damages.

Plaintiffs urge the Court to use the third method—using a multiplier of compensatory damages to calculate punitive damages—and award punitive damages at a factor of three times compensatory. ECF No. 20-2 at 50. The multiplier is chosen depending on "various factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding of terrorist activities." *Hamen v. Islamic Republic of Iran*, No. CV 16-cv-1394, 407 F. Supp. 3d 1, 2019 WL 4305462, at *10 (D.D.C. Sep. 10, 2019). Cases using a multiplier of greater than one to calculate punitive damages tend to involve large-scale terrorist attacks resulting in numerous deaths. *See Stearns v. Islamic Republic of Iran*, No. 17-cv-131, 2023 WL 4999215, at *1, *4 (D.D.C. Aug. 4, 2023) (using a multiplier of three in a case involving "a series of attacks involving explosively formed penetrators" that killed multiple people); *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 29, 41 (D.D.C. 2022) (using a multiplier of two in a case involving a series of attacks in Israel resulting in multiple deaths). The circumstances here,

while undeniably tragic, do not parallel the large-scale attacks that have previously warranted multipliers of greater than one for punitive damages.

Many courts with facts similar to those here have awarded punitive damages in an amount equal to compensatory damages. *See Boothe*, 2026 WL 809887, at *18 (finding an award of punitive damages equal to compensatory damages to be "commensurate" with the harm caused to U.S. soldiers injured in terrorist attacks); *Wamai*, 60 F. Supp. 3d at 97 (awarding "punitive damages in an amount equal to the total compensatory damages" where "[d]oing so will result in a punitive damage award consistent with the punitive damage awards in analogous cases"); *Selig*, 573 F. Supp. 3d at 77. In *Cabrera*, Judge Bates awarded punitive damages equal to compensatory damages in a case arising from the same attack at issue here. Order Awarding Punitive Damages to Afghanistan-based Plaintiffs (*Cabrera* ECF No. 315) at 4, 19-cv-03835 (D.D.C. July 14, 2025). Accordingly, seeking consistency with *Cabrera*, and given the nature of the Attack and proper application of the factors outlined above, the undersigned recommends awarding punitive damages in an amount equal to compensatory damages. Not only does this approach have "the merit of following Supreme Court precedent on punitive damages,"[6] *Selig*, 573 F. Supp. 3d at 77, the "method of doubling the compensatory damages also provides 'a bad man' with a modicum of predictability," *Abedini*, 422 F. Supp. 3d at 142. And, importantly, equalizing compensatory and punitive damages still acts as a "forceful deterrent against Iran's further support" and commission of terrorist acts. *Sheikh*, 485 F. Supp. 3d at 273.

[6] In *State Farm Mutual Automobile Insurance Co. v. Campbell*, the Supreme Court held that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U.S. 408, 425 (2003). Although Iran, as a foreign sovereign, has no rights under the Fifth Amendment's Due Process Clause, courts adjudicating FSIA matters have looked to the constitutional limits on punitive damages "insofar as they embody general concerns for fairness and consistency." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 126 n.37 (D.D.C. 2015). Like those courts, this Court, too, finds those limits instructive.

5. *Post Judgment Interest*

Finally, Plaintiffs seek post-judgment interest. An award of post-judgment interest is determined by federal law pursuant to 28 U.S.C. § 1961(a). Section 1961 states that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a). "[A]n award of post-judgment interest under this statute is mandatory, not discretionary." *Doe A-1*, 2021 WL 723257, at *9; *see also Selig*, 573 F. Supp. 3d at 78; *Boothe*, 2026 WL 809887, at *18. The Court should therefore award Plaintiffs post-judgment interest at the statutory rate as established in 28 U.S.C. § 1961(a).

## IV. CONCLUSION

Given Defendant's failure to respond to the Complaint and the adequacy of the Plaintiffs' Motion for Default Judgement, the undersigned recommends that the motion (ECF No. 20) be granted and that the Plaintiffs be awarded damages in the amounts specified in the table below.

**Summary of Damages**

| **Damages** | **John Stanz and Family** | **Marc Laliberte and Family** | **Jason Roberts and Family** |
|---|---|---|---|
| **Pain and Suffering for Servicemember Plaintiffs** | $7,000,000 | $7,000,000 | $7,000,000 |
| **Lost Earnings for Service-member Plain-tiffs** | $3,956,666 | $2,494,845 | $3,961,672 |
| **Lost Household Services for Servicemember Plaintiffs** | $465,529 | $258,748 | $385,676 |
| **Solatium for Family Mem-ber Plaintiffs** | John Stanz $2,500,000<br>Lisa Destro $1,562,500<br>Stacy Waite $1,250,000<br>Amy Pavlovich $1,250,000 | Juliette Laliberte $4,000,000<br>Shyanne Laliberte $2,000,000<br>Julia Laliberte $2,000,000<br>James Laliberte $2,500,000 | Christina Roberts $4,000,000<br>John Roberts $1,250,000 |

| | | | |
|---|---|---|---|
| | Tara Archfield $1,250,000 | H. L. $2,500,000 | |
| | Cassie Stronz $1,250,000 | Betsy Laliberte $2,500,000 | |
| | Joseph Stanz $1,250,000 | John Laliberte $1,250,000 | |
| **Punitive Damages for Servicemember Plaintiffs** | $11,422,195 | $9,753,593 | $11,347,348 |
| **Punitive Damages for Family Member Plaintiffs** | John Stanz $2,500,000 | Juliette Laliberte $4,000,000 | Christina Roberts $4,000,000 |
| | Lisa Destro $1,562,500 | Shyanne Laliberte $2,000,000 | John Roberts $1,250,000 |
| | Stacy Waite $1,250,000 | Julia Laliberte $2,000,000 | |
| | Amy Pavlovich $1,250,000 | James Laliberte $2,500,000 | |
| | Tara Archfield $1,250,000 | H. L. $2,500,000 | |
| | Cassie Stronz $1,250,000 | Betsy Laliberte $2,500,000 | |
| | Joseph Stanz $1,250,000 | John Laliberte $1,250,000 | |
| **Total Compensatory Damages** | $21,734,695 | $26,503,593 | $16,597,348 |
| **Total Punitive Damages** | $21,734,695 | $26,503,593 | $16,597,348 |
| **Total Damages** | $43,469,390 | $53,007,186 | $33,194,696 |

* * * * *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: October 9, 2026

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE